ANDREW D. HEPBURN, PLAINTIFF IN ERROR v. JACOB DUBOIS, LES-
SEE OF OLIVER S. WOLCOTT.

The deed of a feme covert, conveying her interest in lands which she owns in fee,
does not pass her interest, by the force of its execution and delivery, as in the
common case of a deed by a person under no legal incapacity. In such cases, an
acknowledgment gives no additional effect between the parties to the deed. It
operates only as to third persons, under the provisions of recording and kindred
laws. The law presumes a feme covert to act under the coercion of her husband;
unless before a court of record, a judge, or some commissioner in England, by a
separate acknowledgment, out of the presence of her husband, or, in these states,
before some court, or judicial officer authorized to take and certify such acknow-
ledgment, the contrary appears.

Where the evidence in a cause conduces to prove a fact in issue before a jury, if it
is competent in law, a jury may infer any fact from such evidence, which the law
authorizes a court to infer on a demurrer to evidence. After a verdict in favour
of either party on the evidence, he has a right to demand of a court of error that
they look to the evidence only for one purpose, with the single eye to ascertain
whether it was competent in law to authorize the jury to find the facts which
made out the right of the party, on a part or the whole of his case. If, in its judg-
ment, the appellate court shall hold that the evidence was competent, then they
must found their judgment on all such facts as were legally inferrible therefrom;
in the same manner, and with the same legal results as if they had been definitely
set out in a special verdict. So, on the other hand, the finding of a jury on the
whole evidence in a cause, must be taken as negativing all the facts in which the
party against whom their verdict is given, has attempted to infer from, or establish
from the evidence.

The decision of the Court in the case of Dubois' Lessee v. Hepburn, 10 Peters, 1,
affirmed.

ERROR from the district court of the United States, for the western
district of Pennsylvania.

This was an action of ejectment instituted by the defendant in er-
ror, for a tract of land, situated in Lycoming county, Pennsylvania
surveyed under a warrant to Joseph Fearon, and patented to him on
the 19th September, 1796. The case was before the Court on a
writ of error, prosecuted by the plaintiff in the ejectment, at January
term, 1836, and is reported in 10 Peters, 1.

Joseph Fearon died seised and possessed of this tract of land, at
Philadelphia, in April, 1810. His heirs and legal representatives
were the children of his two brothers, Abel Fearon, and William
Fearon; both Abel and William having died in the lifetime of Joseph

VOL. XII.—2 X

Fearon. The children of Abel Fearon were, Robert Fearon, of the city of Philadelphia, since deceased; Joseph Fearon, of Northumberland county, Pennsylvania; Sarah Fearon, since intermarried with Christopher Scarrow, residing at the time of the death of Joseph Fearon, in England; Elizabeth Fox, afterwards intermarried with Joseph Fox, then residing in England, and afterwards in Philadelphia. The children of William Fearon were, John Fearon, formerly residing in Centre county, Pennsylvania, since deceased; William Fearon, also residing in Centre county; James Fearon, residing in Philadelphia; Sarah Fearon, intermarried with Robert Quay, residing in Lycoming county, Pennsylvania; and Nancy Fearon, intermarried with Samuel Brown, residing in Centre county, Pennsylvania. By deed of partition, dated the 12th and 26th days of March, 1825, William Fearon's heirs made, on their part, partition of the real estate of Joseph Fearon, between the two branches of the family of Joseph Fearon; and by that deed, the tract of land for which this ejectment was brought. No. 5615, was allotted, inter alia, to the heirs of Abel Fearon. The deed of partition from the heirs of Abel Fearon, to the heirs of William Fearon, was executed on the 12th March, 1825, by Joseph Fearon, in person, and by Elizabeth Fearon, and Christopher Scarrow, and Sarah, his wife, by power of attorney to John Curwen, and John Wilson. The power of attorney was dated on the 11th day of February, 1811. The privy examination of Mrs. Scarrow to the power of attorney, was not taken. On the 13th November, 1827, a partition was made by the heirs of Abel Fearon, by which partition of the part of the estate of Joseph Fearon, conveyed to them by the heirs of William Fearon was made. The deed of partition was executed by Joseph Fearon, Jacob Fox, and Elizabeth Fox, in person, and by Christopher Scarrow and Sarah Scarrow, by their attorney, Nathaniel Nunnelly. The power of attorney to Nathaniel Nunnelly, was dated on the 25th June, 1828, without the privy examination of Mrs. Scarrow. This power of attorney was ratified and confirmed, with the privy examination of Sarah Scarrow, on the 8th September, 1832, by Christopher and Sarah Scarrow. The premises for which the ejectment was instituted, were, by these conveyances and confirmations, vested in Joseph Fox and wife; who, by deed of 16th April, 1830, conveyed the same to Benjamin E. Valentine; from whom they afterwards came, by regular conveyances, to the lessor of the plaintiff in the ejectment.

[Hepburn v. Dubois.]

The plaintiff in error, the defendant in the district court, claimed the tract of land for which the ejectment was brought, under a sale of the same for county and road taxes for the year 1825, made under the laws of Pennsylvania, amounting, together, to one dollar and ninety-five cents. The county tax was assessed prior to the 1st of February, 1825; the road tax was assessed on the 29th April, 1825. On the 12th June, 1826, the tract No. 5615, was sold to the defendant for the sum of five dollars and fifty-two cents, the amount of the taxes and the costs; and on the 15th July, 1826, the same was conveyed by deed to the defendant, by Mr. Brown, treasurer of the county.

The plaintiff below, to overthrow the tax title of the defendant, gave in evidence an offer to redeem the property sold for taxes; which offer was made by Robert Quay, jr., acting for and under the directions of his father, Robert Quay, Esq., within two years after the sale for taxes. The treasurer of the county refused to receive the amount of the taxes from Robert Quay, jun., so representing his father, Robert Quay, Esq., alleging that Robert Quay was not the owner of the land, and that by the law of Pennsylvania, no one but the owner or his authorized agent, could receive land sold for taxes.

The cause was tried in October, 1836, and a verdict was given for the plaintiff, under the charge of the court. The defendant excepted to the charge of the court, and prosecuted this writ of error.

On the trial of the cause in the district court, the counsel for the plaintiff in the ejectment requested the court to charge the jury:

1st. That the law authorizing the redemption of land sold for taxes, (viz. the law of Pennsylvania, passed the 3d of April, 1804, and its several supplements,) ought to receive a liberal and benign construction, in favour of those whose estate will be otherwise divested.

2d. That under the said law any person has a right to redeem unseated lands sold for taxes, by a payment of the tax, costs, and per centage, within the time named in the said acts.

3d. That any person having, or believing himself to have, an interest in the lands so sold, has a right to redeem the same within the time named in the said acts.

4th. That any person having the charge of such lands from the owner during his life, after his decease, intestate, and without a countermand of such charge, has a right to redeem such lands so sold,

5th. That any person being a tenant in common of the land so sold, has a right to redeem.

6th. That the deed of partition, dated the 26th March, 1825, in evidence in this cause, did not take effect as a divestiture of the estate of Robert Quay and wife, in the land claimed in this eject-ment, tract No. 5615; until the same was consummated by its ratifi-cation by Christopher Scarrow and wife, by their deed, on the 8th September, 1832: the said Robert Quay, in right of his wife, was a tenant in common of the said tract, No. 5615, and had a right, in May, 1828, to redeem the same from the sale for taxes.

7th. That the refusal of the treasurer to receive the redemption-money for lands so sold for taxes, is equivalent to, and dispenses with a tender of the same.

The court instructed the jury as requested in the plaintiff's first proposition. The instruction asked in the second proposition was refused. On the third proposition, the court said: Any person hav-ing an interest in land so sold, has a right to redeem the same within the period named in the act; but a mere opinion, without right or having an interest, confers no power to redeem.

The court refused the instruction asked in the fourth proposition; and in answer to the fifth proposition, said: A tenancy in com-mon, or any other interest in the land, legal or equitable, confers a right to redeem. The court gave the instruction asked in the sixth and seventh propositions.

The counsel for the defendant requested the court to instruct the jury as follows:

1st. That by the legal construction of the several letters of attor-ney, and the ratifications and confirmations thereof, and of the various deeds given in evidence in the trial of this cause, Robert Quay, at the period of the sale of this tract of land to A. D. Hepburn, and at the time the alleged offer to redeem was made; had, neither in law nor in equity, a right to the possession, enjoyment, or ownership, or a right of entry to the land in controversy; and could not make a legal offer to redeem, which would avoid the title of the defendant, unless he was the authorized agent of the owner.

2d. That the partitions of 1825, being executed by the duly autho-rized attorneys, in fact, of Christopher Scarrow and wife, and Eliza-beth Fearon and Joseph Fearon, representatives of Abel Fearon, in conjunction with the heirs of William Fearon, and possession having

been taken in accordance with the deeds, are binding on all the parties, and valid.

3d. That, at all events, said partition was binding on Mrs. Scarrow during her coverture; and could only be avoided, if at all, by her or her heirs on the death of her husband, no other person having the right to object thereto; and she having ratified and confirmed it during coverture, the plaintiffs, or Robert Quay, cannot impeach the validity of the said partition, as of the date of 12th March, 1825.

4th. That it is not necessary for a feme covert to acknowledge an agreement, or power to make partition, under the act of the 24th February, 1770, of lands which descend to her in Pennsylvania, where the partition is equal at law: being compelled to make partition, she can do so amicably.

5th. That Quay, and Fox and wife, and their alienees, are estopped from questioning the validity and consummation of the partitions in 1825, by their execution and delivery of the various deeds and letters of attorney given in evidence on the trial of this cause.

6th. That the denial of the agency and ownership of Quay, by Fox, and his right to redeem, if the jury believes Harris's testimony, is conclusive; and precludes him, or his alienees, from subsequently claiming any right by or through the acts of Quay, or his son.

7th. That on the legal construction of the act of 1815, no person has a right to redeem land sold for taxes but the owner, his heirs or assigns, or legally authorized agent or representative. If the jury believe that Quay was not the owner, or the agent of the owner, the alleged offer to redeem made by him, or his son, are of no validity; and the plaintiff cannot recover.

8th. That if Quay did not make the alleged offer to redeem as owner, or agent of the owner of the land, but in fraud of the owner's right, and for the object of benefiting himself by taking the timber off and obtaining a right to the land; it would not divest the title of the defendant.

9th. That the offer to redeem must be a legal tender, unconditional and unrestricted; and if the jury believe the testimony of Robert Quay, jr., no such legal tender was made; nor was it such an offer and refusal, as would bring this case within the saving clause of the 4th section of the act of the 13th March, 1815.

10th. That from the testimony disclosed the taxes for which the land was sold were assessed, and that the deed from the treasurer to

the defendant, *on the face of it,* vests in him a complete title to the land in controversy.

11th. That if the jury believe the testimony of Robert Quay, jr. and of Joseph F. Quay, neither of them were the agents of Jacob Fox, under whom the plaintiff claims; when Robert Quay, jr. called on Harris to attempt to redeem the tract of land in dispute. Therefore, the plaintiffs cannot recover.

The court refused to give the first instruction. As to the second proposition, the court said: So far as it is necessary to the issue on trial, the legal effect of the partition of 25th March, 1825, is noticed in answer to the sixth instruction of the plaintiff's counsel. The deed of partition of the 12th of March, 1825, and the possession which it is alleged was taken in accordance with the deeds, cannot vary that instruction.

As to the third instruction, the court said: The Supreme Court have in effect decided this point. Mrs. Scarrow's interest remained undivided until the deed of confirmation in 1832. The partition of March, 1825, was not binding on her until then: and although Robert Quay and wife cannot impeach its validity, they held until then an undivided interest in the land in question.

The court refused to give the fourth instruction, on the authority of the decision in 10 Peters, 22.

As to the fifth instruction asked, the court said: Quay and wife, and Fox and wife and their alienees, were estopped from questioning the validity of the partitions of 1825, after they were legally accepted by all the parties to them; and the various deeds and letters of attorney derive their validity from that acceptance.

The sixth instruction was refused. As to the seventh and eighth instructions, the court said: A redemption of land sold for taxes, under the act of 1815, can only be made by the owner, his heirs or assigns, or legally authorized agent or representative; or by a person acting for the owner, with his subsequent ratification. If Quay was not the owner or part owner, or the agent of the owner, the alleged offer to redeem made by him or his son, not so ratified, has no validity; and the plaintiff, in such case, could not recover. But Quay's interest in the land was not divested at the time he caused an offer to be made to redeem; and that offer cannot, therefore, be legally regarded as in fraud of any person's rights.

Ninth: The offer to redeem must be of the nature here stated; but from the testimony of Robert Quay, and other witnesses to the

[Hepburn v. Dubois.]

same point, the tender made was sufficient, under the saving clause of the act of March, 1815.

The tenth instruction was given, as was also the eleventh; except the concluding words, " therefore, the plaintiff cannot recover."

The case was argued, at large, on all the points presented by the bill of exceptions, orally, by Mr. S. Hepburn, and a printed argument by Mr. Potter for the plaintiff in error; and by Mr. Tilghman and Mr. Anthony, on a printed argument, for the defendant. The opinion of the Court having been confined principally to one point, it has not been considered necessary to report the whole of the arguments of the counsel for the plaintiff or the defendant.

The counsel for the plaintiff in error presented the following points to the Court:

1. That Robert Quay, at the time of the alleged offer to redeem under the legal construction of the two deeds of partition, between the heirs of Abel and William Fearon, and the ratifications and confirmations thereof, and of the various deeds and articles of agreement given in evidence, could not make a legal offer to redeem.

2. That the partition was binding on Mrs. Scarrow during coverture, and could only be avoided by her or her heirs on the death of her husband, who is yet in full life.

3. That it is not necessary for a feme covert to acknowledge an agreement or power to make partition, under the act of the 24th February, 1770, of lands which descended to her in Pennsylvania; when the partition is equal.

4. That Quay and wife, and Fox and wife, are estopped from questioning the validity of the partitions of 1825, by their execution of the several deeds, &c., given in evidence.

5. That the denial of the agency and ownership of Quay, and of his right to redeem, by Fox, is conclusive on him and his alienees; and precludes them from claiming, subsequent to such denial, any right of redemption by or through the acts of Quay and his son.

6. That the court below erred in their answers to the 1st, 2d, 3d, 4th, 5th, 6th, 8th and 9th points submitted.

After stating that the facts embodied in the record of the present case presented new and distinct considerations for the Court, from those embodied in the record of the former trial of this suit between the same parties; Mr. Hepburn proceeded to state the title of the defendant in error; and showed that title, traced from Joseph Fearon

the elder, who was the original warrantee of the commonwealth of Pennsylvania, down through the different divisions and partitions of the real estate of Joseph Fearon, deceased, amongst his heirs at law, to the defendant in error. He then proceeded to state the title of the plaintiff in error, (the defendant below,) which was derived from the treasurer of Lycoming county, by deed, dated 15th July, 1826, under a sale of the tract of land in question for taxes, due and unpaid, previous to such sale; under the provisions of the different acts of assembly in relation to the sales of unseated lands in Pennsylvania. He referred to the different acts of assembly applicable, and contended that in terms the right of redemption attempted to be set up by Robert Quay, in May, 1828, was unauthorized by the provisions of those acts, and could not divest the title of the purchaser acquired by him under the sale. And after reviewing the facts in relation to the situation, and rights of the several parties in interest, under the different deeds of conveyances, partitions and confirmations thereof by the different parties in interest, together with the facts in relation to the alleged offer to redeem the land sold by Robert Quay; Mr. Hepburn assumed the following general propositions, for the consideration of the Court:

1st. Whether, under the facts disclosed by the record in this case, upon a proper construction of the different acts of assembly of the state of Pennsylvania in relation to the sale of unseated lands for taxes, Robert Quay had such an interest in the tract of land in dispute, No. 5615, at the time of the sale of it for the taxes by the treasurer of Lycoming county, on the 12th of June, 1826, or at the time the alleged offer to redeem was made by his son under his directions, in May, 1828, as brought him within the saving provisions of the fourth section of the act of 1815, and authorized a tender of the redemption money by him. In other words, was Quay the owner, or agent of the owner, of the tract of land in dispute, on the 12th of June, 1826, or in May, 1828?

2d. Was the tender such as is contemplated by the act of 1815, viz. a "legal tender;" and has it been followed up by the defendant in error (plaintiff below) so as to enable him to claim the benefit of it in this suit?

3d. Can the defendant in error, under the facts disclosed by the record, take advantage of the tender of the redemption money, by Quay or his son, (if the Court should be of opinion there was a legal one,) contrary to the express dissent of Jacob Fox, the owner at the

[Hepburn v. Dubois.]

time, and when he had given the treasurer notice that Quay had no right to the land in controversy; and when he had afterwards approved the act of the treasurer in his refusal of the tender made by Quay?

4th. The construction of the acts of assembly of the State of Pennsylvania in relation to the sale of unseated lands for taxes by the supreme court of Pennsylvania.

Under the first proposition Robert Quay had no pretensions of ownership to the tract, No. 5615: in point of fact he expressly says so in his own deposition; tells others he has no interest as owner; these facts are fully proved by the record. He never pretended that he was the agent of the owner; and Fox has been equally explicit in his denial of Quay's agency, in relation to this alleged tender. These facts are also apparent upon the record.

Were the parties to the different deeds embodied in the record mistaken as to their rights? And had Robert Quay, in contemplation of law, such an interest as owner or part owner of the tract of land in dispute, as authorized his tendering the redemption-money?

If the partitions of 12th and 26th of March, 1825, were perfect, and vested the estate of the grantors in the grantees of those deeds, the question is answered. And we say they did, without the separate examination of Mrs. Scarrow; in accordance with the 2d section of the act of 24th February, 1770.

This section changed the common law mode of conveyance, and was intended to supply the place of fines and recoveries. But it does not embrace the case of partition of lands which descended under the intestate laws of Pennsylvania. 'Tis true that lands descend to the heirs at law in Pennsylvania, as tenants in common, but with scarcely an incident connected with that kind of an estate at common law: they are tenants in common, in pursuance of the statute regulating descents in Pennsylvania, and are placed more upon the footing with coparceners in England, or at common law, than any other description of tenants of real estate.

Tenants in common, at common law, were not compelled to make partition of their estates; they always derived their title by purchase. Hence, livery of seisin was necessary to vest their estate; and the same notoriety was required to divest it, and vest in their grantee.

Not so with coparceners at common law, nor with the estates of those derived under our intestate laws. They both take by descent:

Vol. XII.—2 Y

the law casts the estate upon them all equally, and they are alike in the possession. It never was pretended that levying a fine, or suffering a common recovery, was necessary to vest the estate absolutely in a grantee coparcener, of lands allotted to them in partition of their estates; because the partition only adjusts the different rights of the parties to the possession; neither take by purchase. 'Tis less than a grant, and neither amounts to, nor requires an actual conveyance. Alnatt on Partition, 124, 125; and authorities there cited.

An infant is compelled to make partition. Ib. 11. A prochein ami may do it for him. Ib. 12.

Parties are compelled to make partition, as well under the statute of descents as at common law, and may do it amicably. Alnatt on Partition, 9; Co. Litt. 171, a. Hargrave, note; Long v. Long, 1 Watt's Rep. 265, 268, 269; 2 Penn. Rep. 124; Barrington et al. v. Clark, 3 Burrows, R. 1801.

A parol partition, followed by a corresponding separate possession, is good in Pennsylvania. Ebert v. Wood, 1 Binney's Rep. 216. A parol partition was good at common law between coparceners. Littleton, sec. 252; 3 Co. Lit. 169, b.

A guardian in Pennsylvania, though not vested with a scintilla of either legal or equitable estate in the lands of his ward, may make a consentable line, and mark the boundaries of his land with an adult, which will be binding. 10 Sergeant & Rawle, 114. And a partition is nothing more than a mere designation of boundary; it passes no interest in the estate to the grantee, other than that originally held. The parties in this case had done nothing more than they would have been compelled to do, upon the application of either party to the proper court. He referred to practice in orphan's court of Pennsylvania, as well as that of common pleas; where partitions of estates are made on application of husbands alone, the wives not parties.

But the supreme court of Pennsylvania have given a construction to the act of 24 Feb. 1770; and say, in so many words, that the acknowledgments of feme coverts are not necessary in cases of partition. 3 Rawle's Rep. 420. This decision, if recognised by this Court, puts an end to any difficulty that may be urged for the want of a proper acknowledgment. The statute is a local one: and this decision has at least become a rule of property in the state in which it was made, and as such recognised by this Court. The case is analogous to the one before the Court.

[Hepburn v. Dubois.]

If this decision is disregarded by this Court, the partition was at all events binding upon Mrs. Scarrow, during her coverture; and could only be avoided by her after the death of her husband, or her heirs after her death. The deed was not void; but voidable at most, only as to her or her heirs. Cowper's Rep. 201; 1 Watt's Rep. 357. The conveyance is not void, but the grantees fail to produce the proper kind of evidence of the execution of it: and so long as the claim of Mrs. Scarrow is not asserted, the whole estate passed to the grantees in those deeds, subject only to her right of re-entry. All-natt on Partition, 22; Co. Lit. 170, b.; Preston on Abstracts of Title, vol. i. page 334, 335; 2 Kent's Com. 133; Clancey on Rights, 161, 162; and did pass to them as of their dates. Conceding this right to Mrs. Scarrow, or her heirs after her death, can the parties to those deeds whose execution of them was perfect, deny the validity of their acts, and take advantage of her privilege? Certainly not. Though the deed may be voidable as to her, (which we deny,) it is valid and binding upon all the others; and they cannot pronounce it invalid. 6 Cranch, Rep. 88; 1 Kent's Com. 414; 2 Sergeant & Rawle, 383, 387, 390; 10 Sergeant & Rawle, 117; 1 Watts' Rep. 266. If the other parties interested in this partition cannot take advantage of the alleged defect, and the privilege is a personal one to Mrs. Scarrow, can she now take advantage of it? A recital of the facts on the record is a solution of this inquiry. She has done all in her power to confirm the estates of all the parties in interest. Confirming a... of the legislature of Pennsylvania, remedying defectively acknowledged instruments, are not uncommon. 10 Sergeant & Rawle, 101; Act of 3d April, 1826; Statutes of Pennsylvania, 187, 188.

The construction given to those statutes uniformly has been, not that the conveyance was void, but that the evidence was defective as to its execution. And suppose the fact of the examination actually to have taken place, but not embodied in the certificate of the officer; the deed would not divest the right of the feme covert, because the party could not prove by any other testimony than the acknowledgment itself, the fact of its having actually occurred. When the legislature, therefore, dispense with that form of proof, the title is perfect as of the date of the original execution of the instrument. 16 Sergeant & Rawle, 35; 1 Watts' Rep. 330; 10 Peters' Rep. 1.

The ratification must operate as a divestiture of the interest of Mrs. Scarrow, by relation to the date of the deed of 12th March,

1825; or the plaintiffs below, defendants in error, cannot sustain this suit.   6 Binney, 454.   Their title is derived through these deeds, and the suit instituted two years before the ratification of Mrs. Scarrow; and if by relation, it enables them to sustain this suit, brought in 1830, certainly it is good for every other purpose.

The argument on the remaining propositions, is omitted, for the reasons already stated.

Mr. Tilghman and Mr. Anthony for the defendant, upon the questions presented as to the operation of the deeds of partition, argued:

It is alleged by the counsel for the plaintiff in error, that it is not necessary in Pennsylvania for a feme covert to acknowledge a power of attorney to make partition, under the act of 24th of February, 1770, of lands which descended to her, when the partition is equal; and on this point they have cited Rhoads' Appeal, 3 Rawle, 420, decided March 30, 1832.

To this there are several satisfactory answers.   The first is, that the question does not arise in the present case.

A careful examination of the power of attorney, dated 11th February, 1811, from Christopher Scarrow and Sarah his wife, and Elizabeth Fearon, to Joseph Curwen, John Curwen, and John Wilson, under which the alleged partition was made; will show it contained no authority to them to make either a partition or an exchange.

It recites that they and their brother, and the children of William Fearon, deceased, are the next of kin of Joseph Fearon, their deceased uncle, and as such, "they, the said Christopher Scarrow and Sarah his wife in her right, and Elizabeth Fearon, have together, with the said Joseph Fearon, their said brother, and the children of the said William Fearon, deceased, become seised or possessed of, or otherwise well entitled to divers messuages, lands, tenements, plantations, property and possessions in the province or state of Pennsylvania aforesaid, and elsewhere in North America aforesaid, late the estate of the said Joseph Fearon, deceased, and all other the estate and effects whatsoever, which he the said Joseph Fearon died possessed of, in certain parts, shares and proportions; and they, the said Christopher Scarrow and Sarah his wife, and Elizabeth Fearon, being minded and desirous to procure the actual seisure and possession of their said respective parts, shares and proportions of the said messuages, lands, tenements, plantations, properties and possessions, and to sell and dispose thereof, and convert the same into money, and to settle the

[Hepburn v. Dubois.]

accounts and affairs of the said Joseph Fearon, deceased:" they
then proceed to constitute the said Joseph Curwen, John Curwen and
John Wilson, jointly and severally, "as their attorneys and attorney,
and to and for each and every of their use and benefit, to enter into,
along with, or without their said brother, the said Joseph Fearon, and
the children of the said William Fearon, deceased, and take posses-
sion of each and every of their respective parts, shares and interest
of and in all and singular the said messuages, lands, tenements, plan-
tations, properties and possessions in any part of North America
aforesaid, or any island contiguous thereto, wherein or whereto the
said Christopher Scarrow and Sarah his wife, in her right, and Eliza-
beth Fearon, or any of them have or hath any estate, right, title or
interest, as two of the next of kin of the said Joseph Fearon, de-
ceased, or otherwise howsoever.   And also for them the said Chris-
topher Scarrow, and Sarah his wife, and Elizabeth Fearon, and in
their each and every of their names, or in the names of them the
said Joseph Curwen, John Curwen and John Wilson, or any of them,
as their or any of their attorneys or attorney, to put up and expose
to sale, (along with or without the consent of the said Joseph Fear-
on, their said brother, and the children of the said William Fearon,
deceased,) either in public auction or by private contract, as they, the
said Joseph Curwen, John Curwen, and John Wilson, or any of them
shall think proper, all their, and each and every of their respective
shares, parts and interests, of, and in all and singular the said mes-
suages, lands, tenements, plantations, properties and possessions, with
the stock, cattle, implements, tools, utensils, furniture, effects and
other things thereto belonging; and to sell and contract, and agree to
sell, their, and each and every of their estate, right, title, share and
interest of, and in the said the several premises, either entire or in
parcels, to such person or persons, and his or their heirs, executors,
administrators and assigns, as shall contract or agree to become pur-
chaser or purchasers thereof, or any part or parts thereof, for such
price or prices as they the said Joseph Curwen, John Curwen and
John Wilson, or any of them shall, together with or without the said
Joseph Fearon, and the said children of the said William Fearon,
think proper to accept for the same.   And in pursuance of the con-
tracts to be made for the sale of their said parts, shares, estates and
interests respectively, of and in the said several premises, for them,
the said Christopher, Scarrow and Sarah his wife, and Elizabeth
Fearon, and each and every of them, and in their each and every of

their names or name, or in their or any of their own proper names or name, as their attorneys or attorney, and as their and each and every of their act and deed, to sign, seal, deliver and execute all and every such deeds, conveyances, instruments and writings, as shall or may be requisite or necessary for conveying and assuring their respective parts, shares and interests of, and in the said several premises; and every or any part or parts thereof to the person or persons, and his or their heirs, executors, administrators and assigns, who shall contract or agree for the purchase thereof, or of any part thereof; and to receive the money to be paid by the purchaser or purchasers of the said several premises, or any part or parts thereof. And on receipt thereof, for them the said Christopher Scarrow and Sarah his wife, and Elizabeth Fearon, and each and every of them, as their each and every of their attorneys or attorney as aforesaid, to sign, seal or deliver any receipts, releases or other acquittances or discharges, for the said purchase money; and also for them, the said Christopher Scarrow and Sarah his wife, and Elizabeth Fearon, and in their each and every of their names or name, or in the names or name of them, the said Joseph Curwen, John Curwen and John Wilson, or any of them in their each and every of their attorneys or attorney as aforesaid, to contract for, make, do, sign, seal, deliver and execute all and every deed, instrument, writing, contract, receipt, agreement, matter and thing whatsoever, which shall or may be requisite or necessary for completing the sales and conveyances abovementioned, and for accomplishing the several purposes aforesaid, or any of them."

In all this, there is not a trace of any authority to make either a partition or an exchange. The parts, shares and proportions were such as they became entitled to, together with their brother, and the children of William Fearon. It was these parts, shares, and proportions that the attorneys in fact were to take possession of, and to sell. They were undivided parts, shares and proportions, such as existed in Sarah Scarrow and Elizabeth Fearon, as tenants in common with the other heirs of Joseph Fearon, at the date of the power. Surely, it will not be contended, that the attorneys in fact were to take possession of a portion allotted in severalty to Sarah Scarrow, and to hold this several possession, along with her brother and the heirs of William Fearon. So with respect to the sale.

The intention was, as the words are, to confer a power to take possession of, and to sell only the undivided right. In this view, all

[Hepburn v. Dubois.]

is intelligible and consistent; and in no other way can the intervention of the brother, and the heirs of William Fearon be reconciled.

The word partition, or exchange, is not to be found in the instrument; yet nothing could be more natural than to use the word, if the thing was intended. This argument derives additional strength from the fact, that when, on the 25th June, 1828, Christopher Scarrow and wife executed a power of attorney to Jacob Fox, and Nathaniel Nunnelly, to make partition of the estate of Joseph Fearon, the appropriate words, "partition and divide," are repeatedly used.

There might be excellent reasons why the two Curwens and John Wilson should be trusted to sell an undivided right in this estate, and yet not be trusted to make a division of it. The property was scattered over a wide range in Pennsylvania, near to and among the Alleghany mountains. A part of it was in Virginia. The attorneys in fact resided, two of them in Philadelphia, and the other within twelve miles of that city. Several of the tenants in common lived in the vicinity of the lands in Lycoming and Centre counties, Pennsylvania. Under these circumstances, the information possessed by the parties could scarcely be equal; and it certainly was prudent, at that time, not to confer a power to make partition.

The sale authorized by this power was for money; and it was only on the execution of a contract and receipt of the money under it, that the attorneys were to execute any release, or other conveyance. The release executed by them was without any other consideration than a quantity of land, estimated equal in value to that conveyed. It was not a partition either in law or in fact; but a proceeding unwarranted by the power, attempting to divide the whole real estate into but two parts, when there were nine heirs; without allotting any particular purpart, either to Mrs. Scarrow or any other heir.

A power to sell does not authorize a partition. 1 Mad. 214; 2d Sugden on Powers, 506; 16th vol. Law Library, 273.

Another objection to the instrument called a partition, dated 12th March, 1825, is, that it purports to be executed by the attorneys in fact of Elizabeth Fearon. Whereas Elizabeth Fearon was married to Jacob Fox, in the year 1812; and in 1825 was a feme covert, and had so been for thirteen years before the alleged partition.

Her husband, Jacob Fox, was, in 1825, tenant by the curtesy, at least, initiate; yet he is no party to the instrument.

As marriage is equivalent to the civil death of the wife; we submit that neither Elizabeth Fearon, then Fox, nor her husband, was bound by the release.

For these reasons, we contend that the power of attorney of the 11th February, 1811 never authorized any partition; and that if it did so, still it was not well executed. If either of these points is with us, the question cannot, in this case, be material; which, after the decision already pronounced, our antagonists again endeavour to bring into doubt, by asserting that the real property of a married woman may, under the laws of Pennsylvania, pass under a power of attorney executed by her in England, and having neither a private examination, or acknowledgment of any kind, before a judicial officer. For this doctrine, they found themselves upon the cases of Rhoads's Appeal, 3 Rawle, 420; and Tate and Wife v. Stooltzfoos, 16 Serg. & Rawle, 35; the application and binding effect of which we will proceed to discuss.

As the case, in 16 Serg. & Rawle, 35, can be very shortly disposed of, it will be first noticed. It decides that "the omission to state in the certificate the acknowledgment of a release by husband and wife, that the wife was separately examined, is cured by the act of 3d of April, 1826. The land was in Lancaster county, Pennsylvania, and an acknowledgment of the release was made by the husband and wife, on the 28th May, 1798, before an associate judge of the court of common pleas of that county. This act of 3d April, 1826, will be found in Purdon's Digest, 5th edition, page 260, 261. It was a retrospective, and retroactive law. Such legislation is always short-sighted and weak in policy, and sometimes wicked in design, as well as effect. Judge Duncan, in delivering the opinion of the court, admits, "that the retrospective powers of this act were to be construed strictly; and that every law of this nature is to be construed with strictness, and not extended by equity beyond the words of the statute," &c.

Now, both the preamble and the enacting clause of this statute, apply only to cases where: 1st. There has been an acknowledgment by the husband and wife. In the present instance, there was no acknowledgment whatever. 2d. The acknowledgment must be "before some judge, justice of the peace, or other officer authorized by law within this state, or an officer in one of the United States, to take such acknowledgment." In the present instance, the power of attorney was executed without the United States, and never acknow-

ledged.   Therefore, both the retrospective law, and the decision, fail to affect us.

Next, as to Rhoads's Appeal, 3 Rawle, 420.   That case arose under an amicable partition, in pais, among the parties.   The devisees agreed that certain persons named by them, should divide their land for them; they accordingly went on it, and did appraise part, and divide the land, and allotted to each devisee his purpart.   The several devisees took actual possession of their shares, and occupied, improved, and, in some instances, sold their parts.   In delivering the opinion of the court, judge Rogers says: "When we couple the words of the deed, with the acts of the parties, in taking possession of their respective proportions in the agreement, improving and selling parts of the same, the intention cannot be mistaken:" and again, "in partition in the orphans' court, the wife is not made a party; the order is made on a petition by the husband, and in right of his wife."   3 Rawle, 436.

By referring to the adjudicated cases in Pennsylvania, it will be seen that even a parol gift of lands by a father to his son, is good, when possession accompanies and follows, and when improvements are made by the son on the land, in consequence of the gift.   It is the delivery of possession, and expenditure of money or labour in consequence of the gift, that takes it out of the statute of frauds.  Stewart v. Stewart, 3 Watts, 253; Eckert v. Eckert, 3 Penn. Rep. 332.   These cases review the doctrine in Ebert v. Wood, 1 Binn. 216; and clearly show that the subsequent separate possession and improvements make the gift valid, and take it out of the act for preventing frauds and perjuries.   21st March, 1775, Purdon's Digest, 408.

Another mode in which married women may make partition, is under the act of 19th April, 1794, directing the descent of real estate, sec. 22; and in case the property cannot be divided, it may be sold under the act of 2d April, 1804, and thus the wife be divested of her real estate by proceedings in the orphans' court.   This, however, is a matter under the supervision and control of the court; who will, as far as possible, protect the rights and interests of married women, and prevent any undue advantage being taken of their dependent situation.   In Watson v. Mercer, 6 Serg. & Rawle, 50, chief justice Gibson deprecates, in strong language, the inefficiency of our laws for the protection of the property of femes covert, and says: "In no country are their interests and estates so entirely at

the mercy of their husbands, as in Pennsylvania; and that it is the policy of the law to narrow the field of this controlling influence. The husband has power to obtain her personal estate, not only without condition, but, in some instances, by means of the intestate acts, even to turn her real into personal estate, against her consent." This evil was, however, remedied on the 29th March, 1832, when the legislature of Pennsylvania, aware of the injustice and oppression frequently practised on married women, remodelled the orphans' court law, and secured their interests in real estate against the rapacity of unprincipled husbands; unless they freely and voluntarily relinquished them before a judge of a court of record, in the absence of the husband. See Purdon's Digest, 788, Partition, sec. 48.

In 1 Miles, 322, Vidal v. Girard, decided September 10th, 1836, Judge Jones refused to order a writ of sale, without a writ de partitione facienda after a judgment "quod partitio fiat;" although the wives and their husbands should file an agreement to that effect. In that case he explains the various kinds of partition, and states that where an action of partition is resorted to, instead of a deed o partition, or other conveyance, they must pursue the act relating to that action. If the wife convey by deed under the act of 24th February, 1770, it must be acknowledged in a peculiar form. Her deed is void at common law; and in England, she can only convey her estate by fine. She cannot appear by attorney, but must appear in person, or by an attorney appointed by her husband; and in conclusion, the judge refuses to waive any proceedings which protect the wife in the enjoyment of her real estate.

The case of Peter Rhoads's Estate, 3 Rawle, 420, may have been well decided as to the partition then before the court. But it does not apply to our case of a division exclusively by deed, where a part of the real estate belonged to a married woman who never acknowledged the power under which it was made, and never was separately examined. The counsel in that case, when arguing in favour of the partition, find themselves compelled to admit, that if the partition had been unequal, perhaps it might be voidable by the married woman, though not void. This is enough for our purpose; for if the partition in May, 1828, was voidable by Mrs. Scarrow, when Robert Quay made the offer to redeem; he had an interest in this very tract, 5615, which, if she refused to sanction the irregular partition, was common property. Now, the fact, that the division made among the various heirs of Joseph Fearon was an equal partition, is most adroitly

[Hepburn v. Dubois.]

assumed by the plaintiff in error. Not one word of evidence exists to prove it. When did it become equal, and in what way? Not until the 8th September, 1832, when Mrs. Scarrow, in legal form, ratified what had been done.

But in May, 1828, when Quay redeemed the land, there was no such equality in point of fact, or in point of law. In fact it never existed; in law it did not exist until 8th September, 1832. Until that date, she and her husband never knew that any partition or attempt at a partition had ever been made. There does not exist any evidence to show they had such knowledge. There is direct and clear proof to the contrary, so late as the 25th June, 1828, which was about a month after Quay redeemed the premises in dispute. For, in the power of attorney of that date, from Christopher Scarrow and Sarah his wife to Fox and Nunnelly, they authorize their said attorneys " to make partition and division of the whole of the said messuages, lands, tenements, plantations, properties, possessions and premises, late of the said Joseph Fearon, deceased, unto, between and among the said Joseph Fearon, (her brother) the children of the said William Fearon, deceased, Jacob Fox and Elizabeth his wife, and the said Christopher Scarrow and Sarah his wife." That is, to divide *all* the property among *all* the heirs. This important fact is noticed in the opinion of the Court, 10 Peters, 21, 22.

Without pursuing the argument further, it is sufficient to remark, that the case reported in 3 Rawle, 420, is essentially different from the present; inasmuch as the former was a partition in pais, and the latter a partition by deed.

Although the counsel for the plaintiff in error, allege that the power of attorney from C. Scarrow and wife, and Elizabeth Fearon, to John Curwen and John Wilson, gave them authority to make and execute deeds of partition; yet, as before stated, on examination it will be found that there was not a syllable said about partition therein, nor was there any separate examination of the wife of C. Scarrow. In pursuance of this supposed authority, Curwen and Wilson, as well as the heirs of William Fearon, proceed to execute deeds of release, in March, 1825; and recite that " in consideration of a quantity of land to be conveyed by a like release, they have remised, released, and for ever quit claimed" the lands therein mentioned; thus demonstrating that a deed of release was the kind of conveyance, or assurance, by which the partition was intended to be carried into effect.

The act of 24th February, 1770, section 2, declares that no grant,

bargain and sale, lease, release, feoffment, deed, conveyance, or assu-
rance in the law whatsoever, shall be good and valid to pass the wife's
estate, unless she is examined separate and apart from her husband.
If, then, it be absolutely necessary to have the separate examination
of the wife in all deeds, releases, conveyances, and assurances what-
soever, in order to divest her interest, can it for a moment be urged
that a power of attorney, wherein a married woman authorizes a
person to release, convey, and assure her lands, requires no such exa-
mination: or in other words, that she cannot herself convey her land,
except by an acknowledgment in a peculiar form, specially provided
to guard and protect her rights; but if she joins her husband in a
power of attorney to a third person, no such acknowledgment is ne-
cessary; and that the third person can "remise, release, and for ever
quit claim," all her estate, and it will be binding on her to all intents
and purposes? It is only necessary to state such a proposition, to ex-
pose its fallacy. Can it even be pretended that the indentures given
in evidence are not such kinds of conveyance as are mentioned in the
act of 24th February, 1770? A deed is a writing sealed and delivered
by the parties. Releases are a discharge or conveyance of a man's
right in lands or tenements to another, who hath some former estate
or possession; the words generally used therein are "remised, re-
leased, and for ever quit claimed" (precisely the words used in the
Fearon deeds). When one of two coparceners releaseth all her right
to the other, this passeth the fee simple of the whole. 2 Blk. Com. 324.

And even if the gentlemen opposed to us call it a partition, it is
that kind of partition by deed, mentioned in 2 Black. Com. 323;
which says, that it is necessary "that they all mutually convey and
assure to each other" the several estates which they are to take and
enjoy separately; and not a partition in pais, by going on the land
and amicably dividing it, and each party taking possession of his
proportion, living on it, cultivating and improving it. In the case of
Rhoads's appeal, the feme covert did not complain of any unfairness
or inequality in the partition. It was equal and just, and was at-
tempted to be set aside by others, in hostility to her interest, and when
she acquiesced therein; but in the present case, the object of the re-
demption on behalf of the heirs of Joseph Fearon, deceased, was to
preserve and protect the rights of each and every heir; and to pre-
vent a part of the estate from going into the hands of a stranger for
a mere nominal consideration; and thus compelling all the heirs,
among whom was Mrs. Scarrow, a feme covert, to owelty of partition,

as the incumbrance was on the land when the division was consummated. Burd v. Semple, 9 S. & R. 109—114; Co. Littleton, 174, c.; 7 Bac. Abr. 231.

This doctrine is examined in Feather v. Stochecker, 3 Penn. Rep. 505, in which it is said that "every exchange implies a warranty. If a stranger enter into the purpart allotted to a coparcener, by an older title, she may enter with the other and compel her to make a new partition." Idem. 508.

And in Gratz v. Gratz, 4 Rawle, 435, the court say, " there must be a complete reciprocity of obligation, benefit and effect, arising from the agreement; otherwise it will not be binding on either. In partition, to pass the respective shares, it must be done by executing mutual releases, so as to conclude the parties from asserting their former rights." Idem. 437.

It, however, is said, that nobody but Mrs. Scarrow could take advantage of this defect in the acknowledgment of the deed of release; and that as she was a married woman having no power to act, nor any privilege on account of her coverture, after two years the title of the purchaser became absolute. Let us ask, of what use to her would be the avoidance of the partition long after the title of the purchaser at treasurer's sale was consummated? She might demand a new division, because her portion of the estate had been taken away by a sale for taxes, which were a lien thereon before the division; but she and all the other heirs would thus equally lose their proportion so sold, and each heir would therefore be equally interested in its redemption.

In 10 Peters, 22, Mr. Justice Baldwin, in delivering the opinion of the Court in this case, (the facts of which have not been altered,) says: "It is perfectly clear, that till the consummation of the partition in 1832, Quay and wife held an undivided interest in the land in question, as owners thereof in common with the other heirs of Joseph Fearon." But the counsel for the plaintiff in error say, the Court were wrong, and their judgment is erroneous. Let us then inquire when Mrs. Scarrow first executed the power of attorney to Nathaniel Nunnelly, not when she acknowledged it. It appears by the power of attorney from C. Scarrow and wife to Nunnelly, that it was only signed and sealed by them on the 25th June, 1828, as their act and deed. So that the redemption was made by Quay more than a month before they ever signed, or in any manner executed the power of attorney; and if the private and separate acknow-

ledgment of Mrs. Scarrow were not indispensable, it most certainly required, that she should know of and assent to the agreement to divide the estate, before it could be legally divided; and that no act of hers in signing the power of attorney to Nunnelly, after Quay had redeemed the land, could have a retrospective effect, and make this act of no validity. If then the power of Scarrow and wife and Elizabeth Fearon to Curwen and Wilson, was of no avail, or was superseded or annulled by the subsequent marriage of Elizabeth Fearon to Jacob Fox, in 1812, thirteen years before they acted under it, there can be no further question as to Quay's right to redeem.

But it is said, that Fox disclaimed the interference of Quay, and approved of the conduct of the treasurer in his refusal of the tender made by his son for him. To this proposition we would reply, that if Quay had an interest in the land, it is of no consequence whatever whether Fox assented or dissented to the redemption. He was only tenant by the curtesy of his wife's real estate, and his interest in unimproved land was trifling. And as remarked by us in the former argument of this cause, 10 Peters, 14, 15, if none but the husband could redeem for his wife, the acts of assembly for the protection of the real estate of married women, would prove a mere mockery, so far as relates to unseated lands.

But the dissent of Fox, of which the counsel for plaintiff speak, was after the two years had expired; and the evidence clearly shows that neither Fox nor his wife had any knowledge of Quay's offer to redeem, within two years after the sale. The treasurer (Harris) says that in the fall of 1828, the last of September or the first of October, two years and four months after the sale, he saw Jacob Fox in Lycoming county, and he told him that Quay had sent down an order to redeem the tract of land that Mr. Hepburn had bought, and that he had refused to take the redemption. Fox told him he had done perfectly right, that Quay was not the owner of the land, had no right to redeem—wanted to steal timber—Mr. Hepburn had treated him like a gentleman. By referring to the testimony of Jacob Fox, it will be seen by the Court, that he derived his information, about Quay's wish to steal the timber, from A. D. Hepburn, and that this caused him to use the language about Quay, which he did to Mr. Harris; but when he found that instead of losing a little timber by the redemption of Quay, Hepburn's gentlemanly treatment was calculated to deprive him and his wife of both timber

and land, he at once " adopted and ratified Quay's act as saving the land for him."

If, then, the dissent of Fox, under any circumstances, would avail Mr. Hepburn, it clearly appears that as soon as he understood the situation of the tract, and that Hepburn's attempt to prejudice him against Quay was merely that he might hold the land himself, he immediately ratifies and confirms the acts of Quay as far as was then in his power; and if the testimony of Fox is to be relied on, it proves too much for the plaintiff in error, as it proves that Hepburn agreed to relinquish the land.

The counsel for plaintiff in error, urge that Quay and wife, as well as Fox and wife, are estopped from questioning the validity of the partition of 1825, by their executing the several deeds given in evidence.

To this point we say, whether they were estopped from questioning the validity of the partition, is not the matter in controversy, but whether they were estopped from saving a portion of the land from loss and forfeiture, on account of the non-payment of the taxes due before partition was made.

The county tax was assessed prior to the 1st of February, 1825. The road tax was assessed on the 29th April, 1825. R. Quay acknowledged the deed of release on the 26th March, 1825, which was nearly two months after the county tax of ninety-five cents was due, for which the land was sold on the 12th June, 1826. This tax was an incumbrance on the land, and any of the heirs had a perfect right to pay it before the sale, and to redeem the land after the sale, to prevent a forfeiture; so that if Quay had divested all his interest by his deed of 26th March, 1825, yet it did not divest him of the right to redeem the land from a sale which was caused by his neglect as well as that of his co-tenants, to pay the taxes due before the release, on the very land of which he was joint owner.

There are three kinds of partition in Pennsylvania: 1st. A partition in pais, by going on the land and setting off to each party his respective portion, and taking possession, occupying and holding it in severalty, as was done in Rhoads's Appeal, 3 Rawle. 2d. A partition by virtue of proceedings in court, as by writ of partition, in the common pleas, or by inquest in the orphans' court: and, 3dly, a partition by deed, wherein the parties grant, assure and convey to each other their several respective purparts of the estate to be held in severalty. It cannot be pretended that the case before us is

embraced within either of the two first named modes of partition. The heirs of the two branches had no intercourse. So little did they know of each other, that although Elizabeth Fearon married Jacob Fox in 1812, none of the heirs of Mrs. Fearon appear to have known it in March, 1825, when the deeds of release were executed.

William Fearon, one of the heirs, swears, that no division had ever been made of the estate of Joseph Fearon previous to those writings in 1825: he says, "I mean the deeds of March, 1825. Both branches were never got together on the ground and made a division. There never was a parol division of these lands between the two branches; there never was a division by word of mouth that I know of; never any other division than the one set forth in the deeds of March, 1825. The tract, No. 5615, I never saw ".

And Joseph F. Quay, says that Jacob Fox and wife never had actual possession of No. 5615. His wife never saw it. C. Scarrow and wife never had actual possession of any of the Fearon lands. They were never in America.

A partition in pais is, therefore, out of the question; and there is no pretence of any proceedings in partition in either the common pleas or orphans' court. It irresistibly follows that it is a partition by deed; and the Supreme Court in this cause say, 10 Peters, 20: "There must be such acceptance of a deed, or partition, as would amount to an estoppel, before the estate can be held in severalty;" and page 20, "that there was a fatal objection to the power of attorney, as there was no separate examination of Mrs. Scarrow, or any acknowledgment by her:" and let us again remark, that the power of Scarrow and wife to Curwen and Wilson, is in the same predicament, and therefore, in the language of the Court, (page 22,) "gave no authority to affect Mrs. Scarrow's real estate till the deed of confirmation, of 8th September, 1832;" and until that period, "the partition was in fieri, and the estate remained undivided."

Mr. Potter, for the plaintiff in error, presented the following printed argument, on the points decided by the court:

The first point, to which I respectfully call the attention of the Court, is, what was the situation of the title, to the land in controversy, on the — of May, 1828, when the alleged offer to redeem, by Robert Quay, was made; and what interest, if any, had he at that period in the lands, which entitled him to the possession, or gave him a right of entry of the whole or any part thereof?

[Hepburn v. Dubois.]

In 1810, on the death of Joseph Fearon, the patentee, the estate, of which this tract constituted a part, descended, by the laws of Pennsylvania, to his heirs and legal representatives, who were the children of his two brothers, Abel and William, both dead, in the lifetime of the said Joseph. The children of Abel, who survived at the death of Joseph, who took a moiety of the estate by descent, were Joseph, Sarah, intermarried with C. Scarrow, and Elizabeth, who afterwards married Jacob Fox. The children of William were John, since deceased, William and James; Sarah intermarried with Robert Quay, and Nancy intermarried with Samuel Brown, who took the other moiety. On the 11th of February, 1811, Scarrow and wife, and Elizabeth Fearon, executed, in England, letters of attorney to John Wilson and others. In 1812, Elizabeth Fearon married Jacob Fox, in England: and from that period up to 1825, Scarrow and wife and Fox and wife, wrote letters to their attorney in fact, Wilson, requesting a divison of the estate between the two branches of the Fearon family; and in 1825, it is proved, that Joseph M. Fox, esq., "was authorized to divide the land," by the heirs of Abel Fearon; on the 12th of March, 1825, a deed of release and partition was executed by Joseph Fearon and Scarrow and wife, and Elizabeth Fearon, now Fox, by their attorneys in fact, Wilson and Curwen, to Robert Quay and others, the children of William Fearon, deceased; this deed, and all the patents and title papers for the whole estate, was taken by Joseph M. Fox, esq., and carried to the house of William Fearon, with the deed of the 25th March, 1825, from R. Quay, et al. to C. Scarrow, et al., which was then executed by the representatives of William, and the respective deeds were mutually delivered, the title papers divided, and each family received the titles for the respective tracts of lands allotted them. After these deeds were delivered, the heirs of each branch took possession of the lands, cultivated them, and paid the taxes assessed on the wild lands allotted them. The respective heirs sold, released and conveyed land in pursuance of the deeds of partition; as will appear by reference to the deeds upon record.

Jacob Fox and wife having emigrated to Pennsylvania, on the 13th November, 1827, they, in conjunction with Joseph Fearon and Scarrow and wife, by their attorney, Nathaniel Nunnelly, made a deed of partition, tripartite, of the lands fully allotted them by the deed of the 25th March, 1825. This deed fully recognised and re-cited the deed and confirmed the partition then made. Thus stood

the rights of the parties in May, 1828. In March, 1827, the treasurer of Lycoming county, Mr. Harris, informed Mr. James Fearon, the brother of Mrs. Fox, of the sale of the tract in question, and of the necessity of its redemption; and in February, 1828, about the first week, the treasurer was again in Philadelphia, and met Mr. Fox, and Nunnelly, the attorney of Scarrow and wife, and informed them fully of the situation of this tract, and advised them to redeem, and communicated to Fox, the claimant and owner of this tract, that Robert Quay, esq. pretended to have an interest in all those lands. The reply was, " that Quay had nothing to do with them that were marked as his." Thus the facts are up to 1828. Did Quay claim to have an estate or interest in the land at the time of the tender; or did he claim to be an agent of the owner? The testimony is full, clear and unquestionable, that he did not affect, or pretend to have a scintilla of interest in this tract, subsequent to the delivery of the deeds of partition of 1825. He swears it expressly himself; his son, J. F. Quay, and Mr. M'Donald, conclusively prove it; nor is there or can there be any allegation of agency. Thus we have the concurrent declaration of Fox, under whom the plaintiffs below claim title, and of Quay; that Quay had no right to this land. Has the law cast upon him, by its operation, a right to the occupancy of the land, and a right of entry into this tract, of which he was ignorant? Two positions present themselves. 1. Were the deeds of 1825, making partition valid, and binding on Robert Quay and wife at this date? 2. Or did the ratification thereof, by relation of law, create a divesture of the estate of Mrs. Scarrow, at the date of the deed of the 12th March, 1825?

The deed executed by the representatives of William Fearon, among whom were Quay and wife, was perfect in all its parts; its execution was in strict compliance with the acts of the legislature of Pennsylvania, relative to the acknowledgment and probate of deeds; it contained the acknowledgment of the receipt of a full and legal consideration for its execution and delivery: and on the day it bears date, was delivered to the acknowledged and recognised agent of the parties, to whom the conveyance was made. A party cannot pronounce his own deed invalid, whatever cause be assigned for its invalidity. 1 Kent's Com. 414; Fletcher v. Peck, 6 Cranch, 88. Under the facts disclosed on the record, could Quay and wife, even if they were desirous to do so, impugn the deed of March, 1825? Not a solitary individual, interested in the estate in 1825, or since,

[Hepburn v. Dubois.]

ever wished to destroy or invalidate the deeds of partition. For a special object and for a limited purpose, strangers who purchased with full notice of the title of the defendant below, now assail and endeavour to overthrow the title of the defendant; but to preserve the partition of 1825, valid as to themselves, and avoid it by destroying a link in the chain of their own title, to divest the estate of the plaintiff in error.

Could Quay and wife have recovered any part or portion of this tract of land in ejectment since 1825? The deed then executed and delivered by them would have been a perfect estoppel to the suit. On its production, no court would have suffered a recovery to have been had in their favour. A person who is entitled, either in law or equity, to the possession or enjoyment of land, or has an estate in it, can enforce that right at law; otherwise he would have a right without a remedy. If Quay and wife had no right which could be enforced by action, on what principle can he redeem? The provision is, "If the owner or owners of land, sold as aforesaid, shall make or cause to be made, within two years after such sale, an offer or legal tender, &c." See 4th sect. of the act of 1815. Throughout, the whole act speaks of the "owner or owners." The act of 1804, in the 2d sect. makes it the duty of the treasurer to take from the purchaser or purchasers, bonds "for any surplus money that may remain after satisfying and paying the taxes and costs." For whose use? For that of "the owner or owners of the land at the time of sale, or their heirs or assigns, or their legal representatives." If this tract had been sold for several hundred dollars beyond the taxes due, and costs; and a bond had been taken from the purchaser; who would have been entitled to the money? Quay? Unquestionably not. Could he have released the bond, and discharged the purchaser from his liability to the owner? It is conceived he could not: that a receipt by him, for payment of the money, would have been no bar to a recovery by Fox and wife, or their assigns, on the production of the evidence on this record. If these positions be correct, then, a fortiori, he had no legal or equitable estate that would authorize her to redeem.

Now, as to Mrs. Scarrow; how was and is she situated in relation to this question? It is not her, or any person claiming under her, that impeaches the validity of the deed of partition of the 12th March, 1825. Have strangers a right to do it? or can others, contrary to her wishes, and against her consent, render null and void,

and hold in fieri, a partition confirmed and consummated by her? The letters of attorney, of 1811, were not acknowledged by Mrs. Scarrow, in pursuance of the directions of the act of 24th February, 1770, to sell and convey lands in Pennsylvania, belonging to a feme covert; it was necessary to have the separate examination, etc. of the wife, and that set out in the certificate by the proper officer. This certificate constituted no part of the instrument, and is but the evidence of its execution. The instrument was perfect without it; but before a court of law could receive it in evidence, the probate must be perfect. It is immaterial when the probate was made, whether at the date and delivery of the deed, or years subsequent thereto. When made, the deed took effect as of its date.

The cases cited fully sustain these positions.

The case of Rhoads's Appeal, 3 Rawle, 420, decides the very point, that an acknowledgment by a wife is not necessary to authorize partition to be made of lands which descend under the intestate laws in Pennsylvania. I would respectfully refer your honours to this case, as the very point was made and elaborately discussed. It has become a rule of property, upon which many valuable estates depend, and will not be lightly disturbed. It is a construction given to a local statute, by the highest judicial authority of the state. In addition to this persuasive reason for adherence to the principle decided in this case, I would respectfully submit, that it is not void of support on common law principles. By statute, those who hold land by descent in Pennsylvania are called "tenants in common;" but by the incidents of the tenure, they approximate to an estate of coparcenary at common law. In Long v. Long, 1 Watts' Rep. 269, the supreme court of Pennsylvania clothed these estates with the incidents of coparcenary. At common law, estates of tenants in common are acquired by purchase; and livery of seisin, etc. accompanies them. Coparcenaries acquire title by descent, and have a unity of interest, title, and possession. It is not necessary to levy a fine, or suffer a common recovery, to vest the estate of a coparcener, in partition; and the same rule is applicable to estates acquired by descent in Pennsylvania. Partition between coparceners does not constitute a conveyance, nor does it pass the land by a fresh investiture of the seisin. It only adjusts the rights of the parceners to the possession. See Allnat on Partition, M. page 124, 125; Ibid. page 21, marginal. The husband and wife are compelled, in Pennsylvania, by statute, to make partition in the orphans' court; and that which they

[Hepburn v. Dubois.]

are compelled to do at law, they may do by agreement. Litt. 171. Hargrave, in a note, says, the above doctrine he takes to be clear law. If the partition is unequal, it is good during the life of the husband. Even infants, if the allotment is equal, are bound by partition; so a prochien ami may make partition on behalf of an infant, because the separation and division of the estate is believed to be for the advantage of the infant. See Long v. Long, 1 Watts' Rep. 275 to 260; Barrington v. Clark, 3 Burrows, 1801; 2 Pa. Rep. 124.

It was, at all events, binding on Mrs. Scarrow during coverture; and as her husband is in full life, no person can avoid it. But as Mrs. Scarrow has ratified and confirmed the partition in the lifetime of her husband, all others are estopped, forever, from denying its validity. The deed was not void; it was only voidable. Cowper's Rep. 291. The estate passed to the grantors by the deed of 1825, during the lifetime of Scarrow. See Mercer & Watson, 1 Watts' Rep. 307. The alienation was good against Scarrow; and he, as baron, had power to transfer the estate of feme, subject to the right of the entry of feme or her heirs, on the death of the husband. 1st Preston on Ab. of Titles, 334, 335; 2 Kent's Com. 138; 3 Serg. & Rawle, 383, 387, maintains the analogous position, as to the right of an infant; and decides that an invalid deed can only be made void by the infant. See also 10 Serg. & Rawle, 117. But it is argued, that the letters of attorney to Wilson and Curwen conferred no authority on them to make partition. If it did not, how can the plaintiff below maintain his suit for the whole tract of land for which a judgment has been rendered in his favour? He claims through and by the partition made under that power. There never was any other division of this estate between the two families of Abel and William Fearon, unless what was done by and under the letters of attorney aforesaid; and their ratification and confirmation created a partition; the estate is yet in common, and the plaintiff below could, under any aspect, only recover the moiety to which Mrs. Fox was entitled by descent. If this position of the defendant in error is true, the judgment must be reversed. The reading of the letters of attorney clearly evidence the intention of the constituents, and show the object they desired to accomplish. They authorize their attorneys "to obtain the actual seisin and possession of their respective shares." The estate was undivided, between—

First, the children of William Fearon and Abel Fearon.

And second, when the general division was made between the two families, the moiety allotted the Abel branch was to be divided between them.

Now, how were the attorneys to obtain the actual seisin and possession of their respective shares, without an equal partition? After they had got "the actual seisin and possession of their respective shares," they had power to sell and convey "their respective shares," and convert them into money. Again: they had power to enter into the possession, "along with, or without the other heirs." They were to take possession of each and every of their respective parts or shares; and had power expressly given "to do all things necessary for accomplishing the several purposes aforesaid." They were sound principles, that every general power necessarily implies the grant of every matter necessary to its complete execution; and that the true rule of construction is, to effectuate the intention of the parties, if such intention be consistent with law. See 4 Dall. 347; 6 Binn. 149; Sugden on Powers, 459. The deposition of Fox proves that the parties contemplated a division; for he says, "we wrote letters to Mr. Wilson to divide the land:" and it was necessary to make a partition, to enable the attorneys to accomplish the purposes designated in the power.

Mr. Justice BALDWIN delivered the opinion of the Court:

This case was before this Court on a writ of error taken by the plaintiff below, to the district court for the western district of Pennsylvania, at the January term, 1836; and all the questions arising on the record, or made by counsel, were there fully considered. The Court, however, took further time for consideration, and at the term of 1836, delivered their unanimous opinion, reversing the judgment of the district court on the merits of the case, as well on the questions of law as of fact; as will appear in the 10th vol. of Peters' Rep. pages 17, 33. Pursuant to the judgment and mandate there rendered, the case was again tried, and now comes before us on a writ of error by the defendant below, after a verdict and judgment below against him; in the argument, of which every point of law and question of fact which came up and was decided before, has been noticed by counsel now.

As relates to the questions of law arising on the great mass of deeds in the former and present record, they are not varied by any

[Hepburn v. Dubois.]

thing which is now brought up for the first time: the want of any operative act by Mrs. Scarrow, which could confirm the alleged partition of 1825, before the duly acknowledged deed of confirmation by her and her husband in 1832, is not supplied. The counsel of the plaintiff in error have indeed contended, that her deed of 1832, operates retrospectively to validate all the previous acts of her attorneys in fact, from 1811 to 1828. But the law is well settled to the contrary. The deed of a feme covert, conveying her interest in land which she owns in fee, does not pass her interest by the force of its execution and delivery; as in the common case of a deed by a person under no legal incapacity. In such cases, an acknowledgment gives no additional effect between the parties to the deed; it operates only as to third persons, under the provisions of recording and kindred laws. The law presumes a feme covert to act under the coercion of her husband, unless before a court of record, a judge, or some commissioner in England, by a separate acknowledgment out of the presence of her husband; and in these states, before some court or judicial officer, authorized to take and certify such acknowledgment. We are bound, therefore, in accordance to what we deem in the former case to be the legal result of all the deeds and facts on the record, to declare, that Mr. Quay had in him such legal right to the premises; on which we then held, and now deliberately hold, to be a scintilla of legal right; which is all that, by the laws of the state, is necessary to entitle the holder of such right to redeem lands sold for taxes.

In urging upon this Court a review of the parol evidence in the record, we think the counsel of the plaintiff in error have asked us to transcend the limits prescribed to our action on questions of fact, by an uniform course of decision from the first organization of this Court, which has been repeatedly defined during the present term, in our opinions, unanimous on the law; though sometimes differing in its application to particular cases. If our past course of adjudication has not sufficed to satisfy the bar, as to what we have considered our most solemn duty; and if it is yet an open question as to what is the line which the law has drawn between those questions of fact cognizable only by the jury below, and questions of law arising on the joint action of the court and jury, in that court whose record we judicially inspect on error; it will be useless to attempt to close it, by any opinion to be delivered in this case.

This Court is committed in language which it neither can nor desires to recall; because that power which we are bound to obey, has

[Hepburn v. Dubois.]

spoken to us, and all the courts in the United States, in terms most imperative.

"The trial by jury is justly dear to the American people. It has always been an object of deep interest and solicitude; and every encroachment upon it has been watched with great jealousy." "One of the strongest objections originally taken against the constitution of the United States, was the want of an express provision securing the right of trial by jury in civil cases. As soon as the constitution was adopted, this right was secured by the seventh amendment of the constitution proposed by congress; and which received an assent of the people so general, as to establish its importance as a fundamental guaranty of the rights and liberties of the people. This amendment declares, that 'in suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved; and no fact trial by a jury, shall be otherwise reexamined in any court of the United States, than according to the rules of the common law.'"  3 Peters, 446.

If this Court can comprehend what these rules are, or promulgate them in intelligible language, they are these:— 

That where the evidence in a cause conduces to prove a fact in issue before a jury, it is competent in law to establish such fact; a jury may infer any fact from such evidence, which the law authorizes a court to infer on a demurrer to the evidence: after a verdict in favour of either party, on the evidence, he has a right to demand of a court of error that they look to the evidence only, for only one purpose, and with the single eye to ascertain whether it was competent in law to authorize the jury to find the facts which make out the right of the party, on a part, or the whole of his case. If, in its judgment, the appellate court shall hold that the evidence was competent, then they must found their judgment on all such facts as were legally inferrible therefrom; in the same manner, and with the same legal results, as if they had been found and definitely set out in a special verdict. So, on the other hand, the finding of the jury on the whole evidence in a cause, must be taken as negativing all facts, which the party against whom their verdict is given, has attempted to infer from, or establish by the evidence,

On the evidence in the former record, we held that it was competent in law, to make out, and for the jury to find the fact of an offer to refund the taxes, &c., so as to give a right of redemption: on the evidence and finding of the jury in the present record, we

[Hepburn v. Dubois.]

are bound to consider the fact of such offer as established, and to hold the facts so found, to bring the defendant in error within the provisions of the laws of Pennsylvania, on which the case turns.

The judgment of the court below is therefore affirmed, with costs.


This cause came on to be heard on the transcript of the record from the district court of the United States for the western district of Pennsylvania, and was argued by counsel. On consideration whereof, it is now here adjudged and ordered by this Court, that the judgment of the said district court in this cause be, and the same is hereby affirmed, with costs.