Douglas, Ch. J.,
delivered the following opinion:
This case was brought up by writ of error from the Jefferson Circuit Court.
The suit was commenced by petition to foreclose a mortgage under the Act of Doer. 11th, 1824, “ To regulate the foreclosure of mortgages at Common Law,” &c. Duval’s Comp., page 38.
The record shews that the mortgage was given on the 19th day o.f Deer., 1836, by the said Thomas Randall to the said Smith & Parramore, the petitioners in the Court below, upon certain lands in the mortgage described, to secure the payment of three certain promissory note of the same date, amounting in the whole to nine thous- and seven hundred and fifty-four dollars and ninety-two cents, one of which said notes was payable one year after the date thereof for the sum of $3027 39 ; one other of said notes was payable two year's after the date thereof for the sum of $3251 64, and the other was payable three years after the date thereof for the sum of $3475 89. The two notes first mentioned were paid before the institution of this suit. The foreclosure is sought, therefore, for the alleged non-payment of the last mentioned note. To this petition the defendant Randall put in three pleas. The first and second áre pleas of payment. In the third plea, the defendant alleged that after the execution of the said deed of mortgage, he did by deed of mortgage duly *417 executed, of which the said Smith and Parramore had notice, mortgage and pledge the lands and property in the mortgage first referred to contained, and conveyed to' the Union Bank of Florida, to secure a certain amount of stock of said -Bank, then subscribed in the name and behalf of said Thomas; and by the terms of the charter of said Bank it was provided and conditioned, that ail money, to be borrowed on the pledge of the stock of .said Bank, where the property so secured was subject to a former- mortgage,- was first to be applied to the payment and extinguishment of said' prior lien, of which provision and condition'in said charter and law aforesaid the said Smith and[ Parramore had notice; and 'further, that on the 12th day of .Decern-ber, 1888, he being then indebted to the said Smith and Parramore as well on the three notes in the first recited mortgage, and in the said petition referred to, as also other promissory notes not secured and provided for in said mortgage, did then by check on the Union , Bank of Florida to said Smith and Parramore delivered, order and direct the payment of the sum of eleven thousand eight hundred and sixty-six 9-100 dollars to said Smith and Parramore, in full payment and satisfaction of said three notes in. the said petition. referred to, and in extinguishment of the lien in said mortgage, and that the said Smith and Parramore did then and there accept the same on said terms, and did on the 14th day of December, 1888, present the said check at the said Union Bank, and did then and there receive payment in full of the same. To each of these pleas a general replica, lion was filed by the petitioners, upon which issue was joined. The payment relied upon by the plaintiff in error was the check for $11,., 866 09 upon the said Bank, given by him to Smith and Parramore, on the 12th day of December, 1838. It appears from the testimony of Hy. L. Rutgers, Cashier, set out in the bill, of exceptions which constitutes part of the record in this case, that the plaintiff in error was at that time a stockholder in,that Bank to the amount of 581 shares, which he had procured at different times by mortgages upon slaves and land; and that he was entitled to draw two thirds of the amount of his shares, say $38,733'34-10.0, and that he had drawn at various- times before the 14th of December, 1838, $18,450 76-100, leaving a balance at the time when the above mentioned check of $11,866 09 was drawn, of $26,282 58 against which he could draw, being $8,616 49 over and above the amount of the check, *418 and $5,140 60 more than sufficient to pay the note On which this suit was brought. At the time when the check was drawn, viz., the 12th December, 1888, upon his complying with the requisitions of the charter, the lands mortgaged by the plaintiff in error to the Union Bank, as appears by' other evidence in the case, included certain tracts which he had purchased of Smith and Parramore and one Jesse H. Willis, which he (Randall) called his Ocilla lands,'and also other land which he had bought of the United States. His indebtedness to Smith and Parramore was,for the purchase money of the lands which he had so purchased of them and of said Willis, who had transferred to them some of Randall’s notes. This check of Randall for $11,866 09, Rutgers, the witness before mentioned, says was presented to him by Reddin W. Parramore, one of the parties, pn the 14th of December, 1888, and paid; and that, Reddin W. Parramore, at the time when he presented the check for payment, delivered to John Parkhill, Esq., who was then Cashier of the Union Bank, (Rut- • gers being at that time Teller), a letter bearing date on the same day that the check was drawn, in which the plaintiff in error said to Parkhill, “T have this day drawn a check in-favor of Smith and Par-ramore for the sum of 11,866 9-100 dollars, to be paid at your Bank, as a loan" On my stock, the whole of this amount goes to extinguish so far the sum due to them on my Ocilla ■ lands pledged to the Bank” It does not appear from the proofs in the cause, that Parramore was expressly informed of the'contents of the letter, or whether it was opened or sealed. The plaintiff in error, however, in his answer to a bill in Chancery, which it appears had been filed by said Bank agajnst himself and others, and which was offered in evidence by the defendants in error ánd permitted to be read to the jury, states that from the nature of the transaction and the perfectly frank and open manner of dealing between the parties, he is fully satisfied that the contents of the letter must have been communicated to Parra-more. It further appears by the bill of exceptions, that the said Jesse H. Willis, and Smith and Parramore, were appraisers of the lands so mortgaged by the plaintiff in error to the Union Bank; and the plaintiff in error in his said answer in the Chancery suit says that “ as well from the fact of said appraisement so by them made as also fróm personal communications made to them by him and Jesse Hi Willis, in his presence, he fully believes that said Smith and Parra- *419 more were advised and well knew’that Ms said lands were proposed to be placed in said Bank by hint, and also that from the proceeds of the loan to be made on the stock so secured on their pledge, defendants (Smith and Parramore) were to be paid, the amount of their lien on said land. Randall, in his letter to Parkhill before mentioned, says, “ I left with you a power of attorney to sign my stock notes for me in my absence, under- which you can still act for the purpose of making a stock note to cover the amount, and also the further sum of .3,000 dollars, for which I have given them a check on your Bank of this date. To avoid trouble, however, I have signed my name on the opposite page to a note in blank, to be filled up as a stock note, if needfuland Rutgers, in his testimony, says the notes in the mortgage of Smith and Parramore amounted to $9,704 on the 12th December, 1838, and that the sum of $11,866 9-100 was paid to Smith and Parramore, as directed by letter of Thomas Randall, to extinguish the sum due to them on the Otilia lands. There was, he says, no actual cancellation that he is aware of. It also further appears from Randall’s answer in the Chancery suit that he, with his proposals to the Bank for stock, exhibited an abstract of title,to the lands proposed to be'mortgaged to secure it, which'contain 2,175 acres, including the lands purchased by him of Smith and Parramore and said Willis, and that he (Randall) stated'-to the Bank that Smith and Parramore had a mortgage on part of it purchased from them and Willis to secure the sum of 12,695 9-100 dollars, which he proposed to pay off from the money first to be loaned on the stock. This sum, it also appears from another part of the answer, included a note for $2,940 18,,'which he (Randall) calls a cash note given by him as part consideration of land. This note, it seems, was included in the settlement of the 12th July,1838, hereafter referred to, together with the first note included in the mortgage to.Smith and Parramore, both of which, including .interest, amounted to-the. sum of $6,350 16, for which Randall gave a check of that date which was returned at the time of the settlement which took place between Mmself and Smith and Parramore on the 12th of December, 1.838, and constituted part of the amount of $11,866 09, for which the check of that date was given, which check it was understood by and between the parties, was (it is stated by Randall in his answer in the Chancery suit) to cover the following, viz: “ This check,, dated 12th July, 1838, paya- *420 bie 1st August, 1838, $6,356 76, add interest four months $169 35 -, note to Smith and Parramore payable 19th December, 1838, $3,251 64 — Jesse H. Willis’ note payable same date, $2,094 34 which several sumes added together make the precise amount of $11,866 09, for which the check of that date was given. This cash note of $2,940 18, and the Jesse H. Willis’ note of $2,094 34, making to. gether the sum of $5,034 52, were not included in the mortgage , both of them, however, appear to have been given as part of the price of the lands purchased by Randall, either of Willis or Smith and Parramore, The note of $2,094 34, given by Randall to Willis, was transferred by him, together with other notes, to Smith and Par. ramore. It appears, too, that Willis at one period held a mortgage on some of these lands, given by Randall to secure the payment of these notes, which as an act of kindness and accommodation to Randal], he (Willis) had given up to Randall, to be cancelled before the notes were transferred to Smith and Parramore; and that Smith and Par-ramore were aware of this fact when they took them. Randall,, however, insists that when he made his statement to the Bank as to the amount of' the mortgage to Smith and Parramore, and when he made the settlement above stated, he acted under the belief that the note of $2,940 18, was included in the mortgage of -Smith and Par-ramore; and we are now asked to correct this mistake of his by applying the amount paid on it to the note now sued upon. But with every disposition to render to the appellant the most ample justice, we find ourselves upon this subject, in this case, without authority to comply with such request. If this alleged mistake can be corrected at all, a Court of Chancery, where all the parties interested can be brought in and have an opportunity to be heard, and where the respective rights and interests of each and all can be adjusted and protected, is the proper forum. We can only decide the case upon the issues before us. It has been urged that this action is in the nature of a suit in Chancery, and that the equitable rights and interests of the parties can be taken into consideration, but it is to be remarked that this is a proceeding under a statute regulating the foreclosure of mortgages by the courts of common law. it is true, as suggested by the counsel for the plaintiff in error that in the case of Manly and Moseley, Adms., &c., against the Union Bank of Florida, decided at {ha last terra of this Court, held, “ that a defendant to a petition for *421 foreclosure under this act, was not, in making his defence, required to conform to all the strict technical rules of special pleading, but that if he sets out his objections or defence substantially, so that the petitioner can readily see and understand the grounds of his objections ; or, in other words, if he sets them out as specifically as he would be obliged to do the matter pi his defence in an answer in Chancery, or in a notice of special matter under the general issue in a suit at law, verified by oath agreeably to the provisions of the statute relating to that subject, it is sufficient.” Reps. S. C. of Florida, p. 182. But this decision was founded upon the peculiar structure and provisions of the act, and we still entertain the same'view of the matter. It was not however intended to be understood by that decision, nor is it inferrable from the language used, that he could put in such a defence as would enable the Court to go into an enquiry as to all the equitable matters connected with the transaction. The question, whether he could do so or not, did not arise in that case ; and what equitable powers the Court might exercise in such a case upon an issue properly presenting such equitable matters to the consideration of the Court, it is not necessary now to decide ; because such an issue in this case has not been made. The issue here, is payment; and if the defendant in a suit in Chancery were to put his ■defence solely on the ground of payment, it is apprehended that he would fail, unless by his proofs he established that defence. And besides, before the plaintiff in error eould have a right to invoke the aid of any Court to correct this alleged mistake, it would be incumbent on him to put (or at least to offer to place) all the parties to the transaction in 41 statu quo ” in relation to it ; for “ he that will have equity done to him must do it to the same person.” Francis’ Maxims, p. 1. 2 Chan. Cases, 194-5. And when a party goes into a Court of Equity for relief he will be compelled to do equity to others. Read vs. Long, 4 Yerger’s Reps., 68-9. Thomas vs. Bush, Admr,, 1 Bibb, 506. McDonald vs. Neilson, 2 Cowen, 139. Lipscomb vs. Littlepage, 1 Hen. and Mumf., 454. This Court, upon the issues here presented, is incapable of enforcing this principle, and there is no voluntary offer to comply with it. And were the Court to undertake to correct the alleged mistake by applying the amount paid on the note for $2,940 18 to the note now. sued upon, we should leave the defendants in error with a claim on the plaintiff in error for the *422 amount of the sum of $2,940 18, with all the interest that has accrued thereon, without any evidence of the debt, and with this debt barred by the statute of limitations. And, moreover, if the Court had the power to correct such a mistake in such a case, there is nothing in this record to show that if Randall was laboring under such a mis-' apprehension as is alleged, Smith and Parramore, or either of them, did anything to cause it, or that either of them was aware of the fact when the check for $11,866 09 was given, or'when it was paid by the Union Bank.
- Whether the note for $3,475 89, included in the mortgage now sought to be foreclosed, has been paid or not, depends upon the manner in which the proceeds of that check were appropriated. The general rule as to the appropriation of payments, was correctly laid down by the counsel for the plaintiffs in error, and was not understood to have been controverted by the counsel on the other side. — ■ Indeed, it is too well settled for controversy, that where a debtor indebted on several accounts, makes a payment, he may apply it to either account. If he does not, the creditor may do so. If neither does, the law will appropriate it according to the justice of the case, provided there are no other parties intei’ested. Tlie United States vs. Kirkpatrick, 9 Wheat., Reps, 720. 5 Cond. Reps., S. C., 740. Gass vs. Stinson, 3 Mason, C. C. R., 110. Postmaster General vs. Novell, Gilpin’s C. C. R., 134. Cremer vs. Higginson and others, 1 Mason, C. C. R., 337 ; and Devaynes vs. Noble, Baring vs. Noble, 1 Merivale R., 605-6.
It was contended, in the argument of this cause, by the counsel for the plaintiff'in error, that this case comes within the exception above stated, viz., that there are other parties interested, and that the law applied the funds of Randall in the Union Bank to the payment of the note secured by the mortgage now sought to be foreclosed, and that he had no right to make a different application of them and leave this note unpaid. • To sustain this proposition, they referred to and relied upon the 8th section of the charter of that Bank. By the 1st section of that charter, (Duval’s Comp., 442), it was provided, that a Bank should 'be established in the city of Tallahassee .under the title of “ The Union Bank of Florida,” with a capital of one million of dollars, and with the privilege of increasing it to three millions op dollars; which capital was to be raised by means of a loan on-the *423 kith of the Territory by the Directors of the Bank ; and by the 8th section, (ibid, 444), it was enacted, that to secure the payment of the principal and interest of the bonds to be issued by the Territory for the purpose of raising the capital of the Bank, the subscribers should give a bond and mortgage to the satisfaction of the Directors, on property to be in all cases equal to the amount of their respective stock, &c.; and it is also provided, that property already mortgaged may be received as a guarrantie. “ Provided,” that there be first deducted from the whole appraised value of the property, at least twice the amount of said mortgages and stock, to be given only to the amount of the surplus after such deduction. “ Provided, however, that such existing mortgage on said property shall not prevent the Board of Directors or Commissioners from receiving it, at its full value, if the subscriber shall actually employ the money to be borrowed from the Bank in the extinguishment of the said mortgage, and its extinguishment shall take place in the presence of the officers of the Bank or their appointed agents.” Duval’s Comp., 445.
Under this provision of the charter, there is no doubt but that the Union Bank might, if such deduction were not made, have applied so much of the money loaned to the plaintiff in error on his stock, as would have extinguished the lien-of his mortgage,to Smith and Par-ramore, or that it was its duty to have done so. But the parties injured by the misapplication of the funds, if indeed any injury has been sustained, or any misapplication has taken place, are not before the Court; and for the reasons above stated; wé have no power, as this case is situated, to bring them here. No one is here complaining of this matter, but ithe plaintiff in error himself; and it will appear, we think, for reasons hereafter to be stated, that he cannot avail himself in this case of that provision of the charter. But has any injury been sustained by any one, in consequence of the non-application of any portion of the proceeds of the check of $11,866 09 to the pay. ment of the note .which is the foundation of this suit 1 Was there any imperative rule of law requiring such application ? It is to be recollected that the whole amount of the loan of the Bank to the plaintiff in error, was $38,733 34. This was raised, as appears by the testimony of Rutgers, the Cashier of the Bank, upon the mortgage of land and negroes. Considerably less than one half of the sum of $38,733 34, it would appear from the testimony before us, *424 was raised on the lands mortgaged to Smith and Parramore. Even if the deduction provided for in the charter were not made, (and we are unable to determine from the record whether it was made or not), those lands having bean mixed up with other lands and with negroes in the transactions of Randall with the Union Bank, it is impossible to say from an inspection of the record in this case, whether the note now sued on should have been paid out of the $18,450 66, which Rutgers says Randall had drawn from the Bank before the 12th of December, 1838, or out of the proceeds of the check, or-whether it should have been paid out of the sum of $6,584 76 which remained to his credit after the check was paid. We cannot say, therefore, even if the deduction above mentioned were not made, that the law (as the case is now presented to us) could have made an application of any portion of the proceeds of the check to the payment of this note.
It was insisted in argument that the charter of the Union Bank is a public act, and that consequently Smith and Parramore were bound to take notice of it; and that, they having appraised the lands which Randall proposed to mortgage to the Union Bank, under an appoint, ment from that institution for that purpose, they were apprised of the intention of Randall to mortgage to the Bank the same lands on which they held this mortgage, and were therefore bound to see that their mort. gage was paid out of the first money loaned to Randall on his stock. Without stopping to determine whether the position in relation to the charter is well assumed or not, it is deemed sufficient to say that if it be, Smith and Parramore had the same right to notice the provision in the 8th section in relation to the deduction above mentioned, and also the provision in the 29th section of the charter, “ that each and every stockholder shall be entitled to a credit or loan equal to two-thirds of the total amount of his shares, (Duval’s Comp., 451), by which they would have seen that Randall would be entitled to draw from the Bank on the lands they had appraised, a sum more than equal to the amount of their mortgage and the check together. So that there seems to be nothing in the provision of the 8th section of the charter relied upon, to affect them in this matter so far as now appears.
It is alleged, further, on behalf of the plaintiff in error, and in sup. port of the issue in this case, that he appropriated so much of the *425 proceeds of the check to the payment of this note as was sufficient to satisfy it and extinguish the mortgage given to sécure its payment ; and reliance is placed upon the letter of Randall to Parkhill of the 12th Deer., 1838, and the statement respecting it in Randall’s answer in Chancery, to sustain this position. In the letter, however, he did not say that the proceeds of the check were to extinguish so far the mortgage to Smith and Parramore, but that it was to extinguish so far the mm due to Smith and Parramore on his Ocilla lands, mortgaged to the Bank. It does not clearly appear whether all of the four notes taken up by Randall in his settlements with Smith and Parramore of 12th July and 12th December, 1838, all of which were included in the amount for which the check of the latter date, were given in part consideration of the Ocilla lands or not. It is pretty evident that three of them were, and if the fourjth (which was given as part consideration of land) was also, then the whole amount of the proceeds of the check, did go to extinguish so far the debt due them (Smith and Parramore) on his Ocilla lands, and ttie terms of the letter to Parkhill, were literally satisfied. But whether this be so or not, it does not satisfactorily appear that Smith and Parramore knew the contents of that letter, or whether the above mentioned deduction had been made from the appraisement of the lands mortgaged ta them, arid afterwards mortgaged to the Bank, or not. And if they even knew that this deduction had not been made, and were also aware of the contents of the letter, the facts, that its contents were not specific as to. the mortgage, that it spoke of extinguishing so far the debt due them, instead of the mortgage which was less than the amount of the check; that they had just given up to Randall the four notes above mentioned, which amounted, with the interest agreed, to just the sum for which the check was given, and that it did not amount to a sum sufficient to cover the three notes exclusive of the note of $2,940 18, and the note now in controversy, and the silence of the officers of the Bank respecting this note and mortgage, were calculated to induce them to believe that it was intended both by Randall and the Bank, that this note which was not then due, should run to maturity. And the renewal of this note by Randall, on the 20th of December, 1844, as shewn by the proof, is pretty conclusive evidence that up to that period neither party had considered it paid. It is true that Randall in his answer in Chancery, alleges that in mak *426 ing the settlement of 12th July, 1838, he acted under his original error to which he had before adverted, that the item of #2,940 18 was included in the mortgage to Smith and Parramore ; but there is nothing in the proofs of the case to lead one to suppose that they had any knowledge of this misapprehension. But if it were otherwise, it is difficult to perceive how it could affect them. It was further argued that the request of Smith and Parramore for a renewal of this note, from a fear that it was liable to be defeatéd by a lapse of five years, tends pf itself to exclude the idea Of its being still secured by a deed of mortgage. But we do not see how such a conclusion necessarily follows. It is true that a deed of mortgage would not be barred by such lapse of time. Suppose, however, that the mortgaged premises, upon a sale under a decree of foreclosure, were not to bring the amount of the debt. Then their remedy would be upon the note for the residue, and is it not reasonable to suppose, that while they were indulging the plaintiff in error with further time, they might wish to guard against the contingency of the note being barred by the statute of limitations ? It would seem so. Seward, the witness, who acted as agent of Smith and Parramore in procuring that renewal, howev - er, says that he made the application for it of his own mere motion. He also further Said that he told said Randall that he had a mortgage ; but he did not shew it. He said it was a correct debt. Being cross-examined, he said Judge Randall looked at the note, said it was a just debt, meant to pay it. This conversation took place on the day of the endorsement. Taking, then, all these circumstances into consideration with the lights we now have before us, we cannot resist the conclusion that in the settlement made on the 12th day of December, 1838, between Smith and Parramore and the plaintiff in error, he specifically appropriated the amount of the check of #11,866 09 of that date to the payment of the notes which he then took Up, and left the note now in suit unpaid.
From the view we have taken of this case we might, perhaps with propriety, spare ourselves the trouble of examining the several errors assigned; but as some of them seemed so strongly relied upon by the counsel for the plaintiff in error, we proceed briefly to consider such of them as appear to be deserving of special attention. The first is, that the Court erred in refusing to let exhibits B. and C. to the deposition of H. L. Rutgers, offered in evidence in the Court be *427 low, to be read in evidence. By reference to the bill of exceptions, it appears that exhibit B. Was a list, or statement, made out by the plaintiff in error and handed to the Union Bank, of the lands which he proposed to mortgage to that institution, to Which was annexed the following remark by him s “ Smith and Parramore have a mortgage on part of it, purchased from them and Willis, to secure the sum of $12,695 09, which I propose to pay off from the first money loaned on the stock. There is nothing, however, to shew that Smith & Parramore had any knowledge of this paper, and it appears to have no bearing upon the issue'in this case. The same remark too, is applicable to exhibit (C.) If they were admissible we can see no injury that the party has sustained by their rejection; and where the party has sustained no injury from the rejection of admissible testimony, he cannot avail himself of the mistake to reverse the judgment. Smith vs. Ruecastle, 2 Halstead, 357. But we do not consider them admissible. To allow such papers to go to the jury would be to permit a party to make evidence for himself. We think therefore, that they Were properly rejected.
The second error assigned is, that the Court erred in allowing the answer of Thomas Randall to the bill of complaint of the Union Bank, exhibited against said Randall and Smith & Parramore, to be read in evidence to the jury without the bill of complaint, to which the same was an answer.
In order to a correct determination of the question here presented, it becomes important to ascertain the. purpose for Which a bill should be before the Court, when the answer is offered in evidence.- It is not as proof, because a bill cannot be used as evidence. Doe on the demise — Bowerman vs. Sybourn, 7 Durnf. and East, 2. The bill, in this case, most certainly could not j for it was the bill of a third party. The reason given in the books why an answer cannot be given in evidence without the bill, is, “because without the bill there does not appear to be a cause depending.” 3 Bac. ab. Title Ev. 559, Archd. Pv. 219. An answer is proved by shewing the allegations in the Court, by shewing the bill which is the charge, and the answer which is, as it were, the defence of the bill. 1 Starkie Ev. 287, 288. An answer in Chancery is proved by the production of the bill and answer, or of examined copies of them; but on proof of the proper officer that the bill has been searched for in the office and *428 cannot be found, the answer may be read without the bill. Roscoe on Ev. 57 — Gilb. Ev. 55, From these authorities it would appear that the object of having the bill before the Court is, to shew a cause is depending and to identify the answer. There is much force in the suggestion made, arguendo, by the counsel for the defendants in error upon this point, that “this reason, although it may have been good in England where the Chancery and Common Law Courts are separate and distinct, will not apply here, where they are blended in one and the same Court; and especially when applied to a case like the present, where the Chancery and Common Law suits were pending in the same Court, and the record of both suits were kept in the same-office by the same clerk. It is a well established principle that Courts take judicial notice of their own records. 2 Bac. ab. Title Evidence, - 64S, 644. But in this- case the objection is not that the answer was permitted to be read without that proof of identity. There is no complaint that the bill was not before the Court, but that the answer was permitted to be read to the jury, without the bill. The entry in the record of the Court below is, “And petitioners further offered to read in evidence to the jury,- the answer of said defendant to the bill of complaint of the Union Bank of Florida, now pending in this Jefferson Circuit Court, to which evidence defendant, by his-counsel, objects, unless the bill of complaint to which it is an answer, be also read to the jury.” Here the pendency of the Chancery suit is distinctly shewn, and we have in this entry record evidence that the bill was before the Court, and that the answer read to the jury was the answer to that bill. It is said in the books that some proof of identity of the parties is requisite. Roscoe on Ev. 57 — Gilbert Ev. 55. Darbuall vs. Howard, R. and M., 169.' No objection appears to have been taken for want of such proof in this case, and could not well be, for the answer contains intrinsic proof of identity. If the name and description of the defendant at law, agreed with the-name and description of the party answering in equity, it is prima facie evidence of identity. Hennell vs. Lyon, 1 B. and A., 182, cited in Roscoe on Ev. 57. That is the case here; and, the answer relating to the same subject matter embraced in this suit, the proof of identity would seem to be complete. The pendency of the suit being shewn, the bill being before the Court, the identity of the answer and the party who made it being shown, there was no valid ob- *429 áection to allowing the answer to be read to the jury, without the bill’s being also read to the jury. The bill, as a general rule, is not read; but an exception to the rule is, that where an answer is an answer to particular interrogatories in the bill, that also must be read. 3 Phil. Ev., 929, per Bailey, Justice, in Rowe vs. Brenton, 3 Mann, and Rye, 271, 273, and Lord Tenterden, Chief Justice, ibid. So, if the answer is obscure, and needs any portion of the bill to be read to explain it, then it may be read — ibid. It does not appear that the Court below refused to permit the defendant to read the bill. If the answer was obscure, or was to particular interrogatories, so that without reading the bill it could not be understood, the proper course, we think, would have been (if he deemed it essential to his interest,) to have moved the reading of it, or such parts of it as were necessary to his case; and if the Court then refused to permit it to be read, he should have excepted, and brought up such part of the bill as he had offered to read, that this Court might be able to judge of its materiality. In the absence of interrogatories, (said Bailey, Justice, in Rowe vs. Brenton, 3 Mann, and Rye, 271,) we shall see from the document itself, whether it be, or be not fairly and distinctly intelligible ; and as no part of this bill is brought up, this duty would seem now to devolve on us, in relation to the answer in question. No principle of law appears to have been violated in allowing this answerto be read to the jury, without the bill having been at the same time read to the jury.
Wfi do not deem it necessary to remark upon the other errors assigned, all of whieh are founded either upon instructions given, or asked and refused to be given to the jury, further than to say that we have examined them all, and do not find that the Court below erred either in. the one or the other.
But if it had, the verdict in this case is conformable to the law and the evidence, and should not be set aside, merely because the Court refused to give instructions which might have been properly given. Thomas et ux, 6 Monroe’s Rep. 61 — Breckenridge vs. Anderson— 3 J. J. Marshall Rep., 717. Nor, if the effect of the instructions be such as the facts authorized, will the judgment be disturbed, merely because the opinion of the Court (in his instructions to the jury,) was given in an improper form, or was founded on a misconception of the law, Lee vs. Chambers, 3 J. J. Marshall, 508. So the refusal of *430 a Court to give instructions which would not benefit the party asking it, is not error — 4 J. J. Marshall, 398- — or an erroneous instruction upon an abstract question of law, which is not involved in the decision of the Court, is not a ground for reversing the judgment. Reed vs. McGrew, 5 Hamm., 375 — Jordice vs. James, ibid, 88.
After a verdict in favor of either party, he has a right to demand of a Court of Errors that they look to the evidence for only one purpose, and with a single eye to ascertain whether it was competent in law to authorize the jury to find the facts which make out the right of the party on a part, or the whole of his case. If, in its judgment, the Appellate Court shall hold that the evidence was competent, then they must found their judgment on all such facts as were legally in-ferrable therefrom, in such manner and with the same legal results as if they had been found, and definitely set out in a special verdict, So, on the other hand, the finding of a jury on the whole evidence in a cause, must be taken as negativing all facts which the party, against whom their verdict is given, has attempted to infer from, or establish by the evidence. Hepburn vs. Hubois, 12 Peters, 376.
Testing this case by the principles here laid down, we think the law is for defendants in error, upon the facts found by the jury.
The judgment of the Court below is therefore affirmed with costs, Per curiam*