JOHN A. SUMMERALL, PLAINTIFF IN ERROR, vs. DANIEL THOMS
AND WIFE, DEFENDANTS IN ERROR.

The circumstance that a person has wishes or a strong bias in reference to the
subject matter of a suit, is not sufficient to disqualify him as a witness.  He
must have a direct interest in the event of the suit, and not merely a col-
lateral interest, which last only goes to his credibility, and ought therefore to
be carefully weighed by the jury.

In an action of detinue brought to recover a slave where the defence set up by the
plea of the defendant is, that the slave sued for never was the property of
the plaintiff, evidence introduced by the plaintiff to establish his title which
shows a verbal contract or arrangement that could not possibly have been
performed within a year, upon which contract or arrangement the title of
the plaintiff depends, the Court ought to instruct the jury to disregard such
evidence, as only tending to prove a contract upon which, by the statute of
frauds, no action could be sustained.

Where persons of the same family dwell together, the possession of slaves living
with them, will be presumed to be in him or her who has the right of prop-
erty.  And where one has had the possession of a slave for five years or
more, under claim or assertion of right, and this claim of right is known to
the other members of the family, such length of possession under such cir-
cumstances, constitutes a good prescriptive right to the slave, and the claim
of the others by suit, after such lapse of time, is barred by the statute of
limitations.

This was an action of detinue for the recovery of a slave, brought
in the Circuit Court of Duval County.   The jury, under the instruc-
tions of the Court, returned a verdict for the plaintiffs, and the defen-
dant brought the case to this Court by writ of error.

The nature of the case—the points ruled by the Court below—the
instructions given—and the testimony of the witnesses, are set out
with precision and exactness, in the opinion delivered by a ma-
jority of the Court.

*Thompson,* for plaintiff in error.

I. As to the first error assigned—the Court below should have
sustained the objection to the competency of Joseph Summerall as a
witness.

It clearly appeared from the testimony that he held property which
he claimed by the same title..   A recovery by the defendants in error

would have estopped them from the assertion of claim by them against him.   The general rule is laid down in 1 Greenleaf on Ev., § 386, et seq.

II.  The Court erred in the refusal to instruct the jury as prayed for by plaintiff in error—

1.  As to the statute of limitations.   The limitation of our statute of 1828, is five years in actions of detinue.   Thomp. Dig., 441, 442. Under similar statutes in Virginia and Kentucky, five years peaceable possession of a slave acquired without force or fraud, will entitle a plaintiff who has lost such possession to recover.   Newby vs. Blakey, 3 Hen. and Munf., 57.   Shelby vs. Guy, 6 Peters Cond. Reps., 345.   Smart vs. Baugh, 3 J. J. Mar., 363.   Clark vs. Butler, 7 J. J. Mar., 194.

In the case at bar, the possession of plaintiff in error was certainly with claim of title, as tenants in common with the defendants in error, if not adverse.   It was peaceable, and not acquired by force or fraud.

2.  As to the question of the statute of frauds.   The agreement to divide the issue of Phœbe as they were successively born, was one which, from its very nature, could not have been performed within the year after the making thereof, and should have been reduced to writing.   Thomp. Dig., 218.   Peter vs. Compton, 1 Smith Lead. Cas., 143, and notes thereto.

The parties to the suit and Joseph Summerall, who are alleged to have entered into this agreement to divide, were all infants.   Joseph says he was too young to understand it.

III.  As to the instructions given to the jury.

1.  Statute of limitations.   This is clearly erroneous, there being no proof in the record of any bailments or delivery by Mrs. Thoms to the plaintiff in error, or indeed proof of any possession in her distinct from plaintiff in error, and adverse to him.   However correct it may be in point of law, it is erroneous as applied to the facts of the case presented in the record.

2.  In reference to the statute of frauds.   Upon this question the Court charged the jury, that the action is not based upon the agreement entered into between Petty and wife and the Summeralls—if it was not so based, then the statute of frauds would apply, provided the contract was executory, &c.

This was clearly a misdirection of the Court. The question was one of title, and *was* based upon the agreement. The property in Phœbe, the mother of the slave in dispute, was proved to be in the plaintiff in error, and in Mrs. Thoms and Joseph Summerall. The slave in dispute, therefore, belonged to the owners of Phœbe, and the right was in all as tenants in common, unless they or some of them had subsequently parted with the title. Mrs. Thoms, as one of the tenants in common with John, could not sue him at law in this action to recover the possession from him. If she has any right of possession or property independent of, or adverse to John, it can only be based upon the agreement to make partition as set up. It is true, the defendants in error did not declare upon the agreement, i. e., count upon it, yet they give evidence of it as a link in their chain of title, and as proof of the severance of the tenancy in common.

The Court, however, finally informed the jury that this question could not be considered on the ground that the statute of frauds should be specially pleaded. It seems to me that the rule of Court on this point was misapprehended by the Court, and it does not apply to a case like this. If the action had been for damages for the non-performance of the agreement, then the defence should have been specially pleaded, but in this action, which is detinue, the issue was upon the title, and the verbal agreement set up was offered as proof of the title necessary to maintain the action. When offered as evidence, it was competent for the other party to oppose the statute of frauds to the effect of the evidence.

As to the question, whether the agreement was executed or executory. An executed contract is one performed on both sides ; this was not such case—there is no proof of performance on either part. There is no proof of any distinct and independent possession of Mrs. Thoms. Neither was there any part performance by Mrs. Thoms within the year, or afterwards.

3. As to possession. The charge or instruction is, that where *several* slaves belong to *several* persons of the same family, the possession is in all.

The proof is possession by plaintiff in error, distinct and separate from the other members of the family since 1841. Plaintiff in error, Mrs. Thoms, and Joseph have not formed one family since 1835— they have lived separately since that time.

*Long & Walker*, for defendant in error :

1. The general rule is, that "a witness is disinterested, who can gain nothing by the event of the suit." 8 Comyn's Dig., 1055. Joseph A Summerall could have gained nothing by the event of this suit, and, therefore, first error is not well assigned.

2. The next objection is, that the husband should not have been joined as co-plaintiff in this action ; but "in a suit for a cause of action accrued to the wife, done in her own right whilst single, she must be joined." 2 Comyn's Dig., 230, note e. Gould's Pleading, 198.

3. As to the statute of limitations. "Adverse possession required to bar the assertion of a legal title by the owner, must be an actual, continued, visible and *hostile* possession." 4 Kent, 446. 2 Kent, 504. "Where there is a doubt whether the possession is *adverse*, or merely permitted by the owner, it is a question of fact for the jury." 2 Starkie Ev., 887.

4. The statute of frauds has no application to a contract which has been fully performed. 1 Kelly, 355—citing Barton vs. Collier, 4 Bing., 309. Shaw vs. Woodcock, 7 B. & C., 73.

LANCASTER, J.

This was an action of detinue, brought by Thoms and wife, to recover possession of a female slave named Sue. There are two counts in detinue. The first charges a delivery of the slave to the defendant, to be re-delivered to the plaintiff, Eliza Thoms, when required. The second charges that, before the intermarriage of the said Eliza with the other plaintiff, Daniel Thoms, that she casually lost the said slave out of her possession, and that the said slave came to the possession of the defendant by finding ; and the usual breaches are assigned to both counts. There is a third count in debt, for the use and hire of said slave.

The defendant pleaded first to the 1st and 2d counts, *non detinet*.

2dly. That the girl Sue, mentioned in the 1st and 2d counts of the declaration, is not the property of plaintiffs, or either of them.

3dly. That the said Eliza Thoms was not lawfully possessed of said slave, as is in the 1st and 2d counts of the declaration alleged.

4thly. As to the third count in the declaration, the defendant pleads, never was indebted in manner, &c.

5thly. A plea to all the counts of the declaration, that the said several causes of action did not accrue within five years next before the commencement of this suit.

On all which pleas, issue was joined.

The testimony given on the trial of the case is set out in a bill of exceptions, and made a part of the record, as well also as the instructions given by the Court.

George Petty, a witness, testified that he sold a negro woman, Phœbe, and her child, Peter, to the children—John A. Summerall, Joseph E. Summerall and Eliza Summerall, (now Eliza Thoms.) There was a bill of sale made to the children of the woman and her child, Peter; the purchase money was three hundred dollars, and the grandfather of the children acted as their guardian, to divide the children of Phœbe between them, after the following manner : John A., the defendant, being the oldest, was to take Peter, and Joseph was to have the next, and Eliza the next, in succession as they were born. Phœbe had other children afterwards—the next after Peter was Peggy, (Joseph's,) the next Patience, (Eliza's.) Peter took sick, and died shortly after or just before the birth of Patience. The next child of Phœbe was a girl, Flora, (owned by John Summerall, or called his.) A little while afterwards, there was a boy, Simon, (under the agreement, Joseph's.) Flora died. The next child of Phœbe was Sue, (Eliza's;) the next Cornelia. All agreed that the children should be divided in this way, in order as they came. He did not know whether the contract was changed—if it was, he did not know it. He supposed that John Summerall claimed and owned Cornelia. He knew nothing to the contrary, but that the children agreed to the division at the time of the purchase. It was over twenty years before witness testified that Phœbe was sold to the children, John, Joseph and Eliza ; and the agreement above set forth, made to divide in succession, was by parol. At the time of the agreement to divide, all the children were under age. Peter, Flora and Cornelia are dead.

Witness thinks Eliza had possession of Sue—Eliza kept house for John for some time. Sue was with her sometimes—called Sue her's ; Sue went to John's house frequently, where Eliza was. It is more than ten years since Eliza lived with John.

Other witnesses were sworn, whose testimony does not materially

vary the testimony above stated, and among others, Joseph E. Summerall, one of the distributees under the above stated agreement, who testified that John had Simon, (one of Phœbe's children.) Witness once disputed claim to Simon, and always regarded him as his own. The three that fell to John died. Was present at the arrangement to divide, but too young to understand. Peter was two or three years old when he died—John claimed him. Flora was three or four years old when she died; Cornelia also was a loss. None of the heirs claimed Peter, Flora and Cornelia. Old Simon, the husband of Phœbe, bought her for $750—which was divided among them.

There is testimony of several witnesses, varying in character, concerning the length of time during which John, the defendant, has had Sue in possession.

Joseph E. Summerall testifies that all the negroes have been in possession of John. Himself and Eliza lived with John, and the children were in possession of all, and at the disposal of each of the owners. After witness and his sister Eliza quit John, he, witness, took one of the children of Phœbe, and Eliza took one. John married in the year 1838, and Eliza has not lived with him since. Sue was an infant at the time, and stayed some time longer. Sue lived with Phœbe until the early part of the year 1844—then went to John's and stayed. Witness thinks he quit staying with John in 1843 or 1844.

Joshua Fennamore testifies that when John, Joseph and Eliza lived together, he used to be at the house of John, and heard him say Sue, or Susan, belonged to Eliza. John was of age, and Eliza kept house for him at the time, and Sue was small. It was eight, ten, or twelve years ago—before John was married.

Hagans, a witness for plaintiff, testified: Don't know as to the title to Sue. Knew Peter—John claimed him. Peter died—John spoke of having lost one of his negro boys. John has had Sue about five or six years. Peter died a good many years ago—John was not of age at the time.

S. Vandergriff testified: Sue has been in defendant's possession since 1841—was at defendant's house, and saw her there then—does not know when she, Sue, left Phœbe. Was all round defendant's kitchen—Sue slept in negro house. Phœbe lived near John Summerall's. She (Sue) was not called Mrs. Thoms property, but undi-

vided property—heard so from Joseph E. Summerall and John's wife. Thoms and wife married on the 7th of October, 1845.

George Petty, the first witness, says : Phœbe lived within gun shot or hailing distance of John, the defendant's, house, but not on his place. At the birth of twins by Phœbe, (which was after she had been sold,) Sue was permitted by Eliza to go and nurse the twins, and afterwards Sue went to John Summerall's. Sue staid with her mother before the birth of the twins—Sue is worth $400. Understood always that Joseph exercised ownership over young Simon.

The first question raised on the record on these proofs is, that there is a misjoinder of plaintiffs to the action—it being shown by testimony, that they intermarried after the passage of the act of 6th of March, 1845, entitled " An act to secure certain rights to women." Counsel for appellant did not insist on this point, and waived it. We do not, therefore, decide it.

The first error assigned is—the Court erred in admitting Joseph E. Summerall to testify, as a witness on behalf of the plaintiff below ; and the ground of objection is his interest. The witness testifies that John, the defendant below, has possession of Simon, one of Phœbe's children. Witness once disputed his claim to Simon, and always regarded him as his own.

George Petty says, " he understood always that Joseph exercised acts of ownership over young Simon, and from this, it may be presumed he feels an interest in the establishment of the parol agreement for the partition of Phœbe's children, in the manner testified to by George Petty—as it appears that all those who, under that agreement, could be claimed by John, had died quite young, and two, at least, before the Summeralls were of lawful age. And that thereby, while John, by such a division, would get nothing, Joseph and Eliza would each get two ; but this is not a direct interest in the event of the suit, and only a collateral interest in the establishment of the agreement by parol, under which the plaintiffs seek to predicate their right of property in the slave Sue in controversy. No question was asked the witness as to whether he was interested in the event of the suit ; and it is not enough that he has wishes, or a strong bias on the subject-matter of the suit, or that he expects some benefit from the result of the trial. 1 Phill. Ev., 47. Stewart vs.

Kipp, 5 Johns. R., 256. Such circumstances may influence his mind, and affect his credibility—they are, therefore, open to observation, and ought to be carefully weighed by the jury, who are to determine what dependence they can place upon his testimony, but they will not render him incompetent—1 Serg. & Rawle, 32. Griswold vs. Sedgwick, 1st Wendell R., 126—and we do not see any error under the circumstances in allowing him to testify. This objection is, therefore, overruled.

The other errors assigned are—

2d. The Court erred in refusing to instruct the jury, as prayed by the defendant below.

3d. The Court erred in their instructions given to the jury.

And this again refers us to the bill of exceptions and the instructions given, and the instructions refused. The defendant objected to the evidence of the agreement to distribute the negroes (the children of Phœbe) as they might be born, among the children, John A., Joseph E., and Eliza Summerall; and that said agreement was void under the statute of frauds as an agreement not to be performed within a year from the making thereof, and not in writing. The Court decided this defence could not be set up under the pleadings in this cause, but that the defendant, to have availed himself of that defence, should have pleaded specially; and the Court charged the jury :— " the action is not based upon the agreement entered into between Petty and wife and the Summeralls; if it was so based, then the statute of frauds would apply, provided the contract was executory; if the contract was executed, then the statute of frauds cannot apply; and as to the fact whether the contract was executed or not, that would be a question for the jury. The rules of Court, however, settle summarily the question. The rule in relation to detinue is explicit." To all which the defendant excepted. The rule referred to in this instruction and decision is in these words : " The plea of *non detinet* shall operate as a denial of the detention of the goods by the defendant, but not the plaintiff's property therein, and no other defence than such denial shall be admissible under that plea." But *non detinet* was not the only plea filed to the counts in detinue of the plaintiffs, by defendant. There is a second plea, which says, the girl Sue (sued for) was not at the time of the commencement of this suit, and is not now, the property of the plaintiff or either of them.

39

And there is yet a third plea which says, that the plaintiff, Eliza C. Thoms, was not lawfully possessed of the said negro Sue, as in the first and second counts of her declaration is alleged. There is still a remaining plea to the whole declaration, which says, the several causes of action in the plaintiff's declaration, or any or either of them, did not accrue within five years next before the commencement of this suit. To these pleas, general replications were filed, so that if any one of them is true, it forms a bar to the plaintiff's action. The statute of frauds does provide that no action shall be brought whereby to charge any person upon any agreement that is not to be performed within one year from the making thereof, unless the agreement or promise upon which such action shall be brought, or some note or memorandum thereof, shall be in writing, and signed by the party to be charged therewith, or by some other person by him thereto lawfully authorized. Tho. Dig., 218. This was an agreement made by the friends of these minor children, at a time when, according to the testimony of the second, *he* was not old enough to understand, and when a breeding woman, Phœbe, the property of the minors, had but one child, to divide her children among the minors, as they should be born, giving the one already born to the oldest, her second to the second, and third to the third, and her fourth then back again to the first minor, and so through again, and this repeated as often as her fruitfulness would permit.

Now it seems difficult and even impossible to suppose, admitting the minor children at the time to be bound by this agreement of their friends, that it was in the contemplation of any one that this agreement could be performed within one year from the making thereof, but on the contrary, it was intended to extend to the time of Phœbe's death, or that point in her life when she should cease breeding, or until the minor children, her owners, should arrive at lawful age. Now suppose Peter, the first child of Phœbe, had lived, and in a few days after this agreement was made, *she* had died, would, or could it be contended, that John, the defendant, was to have the whole avails of her purchase and his brother and sister be pennyless ? Suppose she had a second child, and died or stopped breeding, then John and Joseph would get a little negro each, and Eliza would go with nothing, even though Phœbe lived ; for we have seen that at the sale of Phœbe, she was regarded as joint property, and the proceeds divided among them.

JANUARY TERM, 1850. 307

Summerall vs. Thoms and wife.—Opinion of Court.

This contract is just such an one as the statute of frauds does provide no action shall be brought upon, whereby to charge any person —it is therefore not evidence to support an action, and ought not to have been admitted. The Court below decided this defence could not be set up under the pleadings in this cause, but the defendant, to have availed himself of that defence, should have pleaded it specially. The plaintiffs count on a right of property, and of having been lawfully possessed, &c. The defendant takes issue by his pleas before noticed, on both these allegations; but there is nothing said in the declaration of this right of property, derived through a verbal agreement made by the friends of the parties, when some, if not all, were too young to understand, and to be executed upon a contingency in a series of years. If a count setting up such right of property had been filed in the cause, it would have been demurrable, but not being there, there was no ground of demurrer, nor can we see what manner of plea could have availed the defendant to defeat the effect of this verbal agreement, as testimony against him. By his pleas, he has met the substantative issuable allegations contained in the declaration, and we think he is not bound to go farther and plead to any supposed allegations that may be framed by proof. If improper proofs are sought to be admitted, they should be objected to; and if proof of any agreement, void by the statute of frauds, is introduced, the jury ought to be instructed to disregard it. But a contract void by the statute of frauds, by reason of its not having been reduced to writing, while it remains executory, may nevertheless be made valid, having been executed by the parties bound by it.

And this leads us to consider, that at the time the agreement in proof in this case was made, the parties in interest were all minors, and at least some of them too young to understand. The doctrine is, that the contracts and acts of an infant are in general voidable, and capable of confirmation when he comes of full age; those alone being treated as absolutely void, which are certainly, and in their nature prejudicial to his interest—2 Greenleaf Ev., 292, Sec. 367; or incapable of being ratified. There is a distinction, however, between those acts and words necessary to ratify an executory contract and those which are sufficient to ratify an executed contract. In the latter case, any act amounting to an explicit acknowledgement will operate as a ratification, as in the case of a purchase of lands, or

goods—if after coming of age he continues to hold the property, and treat it as his own, he will be liable for the purchase money. But in order to ratify an executory agreement made during infancy, there must not only be an acknowledgement of liability, but an express confirmation or new promise (or agreement) voluntarily and deliberately made, by the infant on coming of age, and with the knowledge that he is not legally liable, or bound by the original executory agreement. See 2 Greenleaf Ev., 293, and authorities there cited. The jury ought therefore, to have been instructed, that unless they believed from the testimony, that after these minors all arrived at full age they all expressly agreed to ratify and abide by the verbal agreement in proof with the knowledge they were not legally bound by it, that they must find for the defendant. In other words, unless the jury believed from the testimony that after the arrival at full age of these parties, they ratified the verbal agreement made in their behalf by Mr. Petty and his wife and their grandfather, [and the making a distribution among themselves of Phœbe's children belonging to them, or an express confirmation or new promise to abide by the agreement, would be evidence of such ratification,] that the plaintiff, Mrs. Thoms, has no separate right of property in the slaves sued for, and cannot recover in this action. There was also some proof going to show that none of the heirs claimed Peter, Flora, and Cornelia, the three who died, and who by the parol arrangement of the friends of the children, would have been assigned to John, and also going to show that John had been in possession of all the negroes, while his brother and sister remained with him, and they have never been delivered to them. If the testimony sufficiently established these facts, of which the jury should be left to decide, then there was no sufficient evidence of an executed contract, and the jury ought to have found for defendants, and ought to have been so instructed. The decision and instruction of the Court below, so far as it is in conflict with the opinion and principles hereinbefore advanced, seems to a majority of this Court to be erroneous.

Defendants urged before the Court that five years' possession of the negro Sue, as in proof, was sufficient evidence for defendants to support the plea of the statute of limitations in issue in this case. The Court decided it was not, and defendant excepted. The Court charged the jury " that the statute of limitations applies where the posses-

sion is adverse. Mere possession is not enough. If the jury are of opinion that the defendants had possession adverse to the claim of property of Mrs. Thoms for five years anterior to the bringing of the suit, then the plaintiff cannot recover. But if the possession in defendant has been adverse, he setting up no claim but possession merely by permission of Mrs. Thoms, then the statute of limitations does not apply. And further, that where several slaves belong to several persons of the same family, the possession is in all." To all which the defendant excepted. The defendant urged that five years possession of Sue by the defendant, as in proof, was sufficient evidence of title, &c., to support the plea of the statute of limitations. The Court decided it was not. We think the position of the defendant in this particular, if allowed by the Court, would take from the jury their province of determining, from the testimony, whether in fact the defendant had had five years' possession of the slave Sue, before suit brought for her. And the Court rightly said the statute of limitations applies where the possession is adverse. To determine whether the possession was adverse, however, depends on circumstances not contained in the instructions. Where persons of the same family dwell together, the possession of slaves living in the same family will be presumed to be in him or her who has the right of property. And if their right of property be joint, the possession of one will be the possession of all. But if they live asunder and in different families, the possession of one is not necessarily the possession of another. It may or it may not be so ; that depends upon the circumstances of the possession, in relation to property claimed in severalty, but it is adverse if such possession has been commenced and continued under an assertion of right on the part of the possessor.

We think, therefore, the charge to the jury should have been—If, from the testimony, they believed the plaintiff, Eliza D. Thoms, and the defendant, John A. Summerall, had not resided together in the same family for five years or more, next before the commencement of the suit ; and if the jury further believed from the testimony, that the defendant had, during that period, held possession of Sue, the slave in controversy, under an assertion of right—that then the plaintiff cannot recover in this action, being barred by the statute of limitations. But if they believed from the proofs, that the plaintiff, Eliza C. Thoms, was at any time, within five years next before the

commencement of this suit, in the actual possession of said slave as her own separate property, then they ought to find for the plaintiff.

In the last of the charge, the Court says: " Where several slaves belong to several persons of the same family, the possession is in all." This charge is of a nature to defeat the plea of the statute of limitations, where one member of a family sues another, though the latter had held slaves under a claim of separate property with the full knowledge of the former, for any number of years. And if the jury understood by it that the possession of the defendant was also, necessarily, the possession of Mrs. Thoms—they being persons of the same family—they were or might have been thereby mislead on the subject of possession ; and it is not perceived why such an instruction, *ex proprio vigore*, would not defeat the plea. But a majority of this Court are not able to see the legal propriety of this instruction. Where the possession of property is in several persons, it is a joint possession, or tenancy in common, and destroys the idea of separate property in any one. In this case, if the possession still remains in all the claimants, then there has been no executed contract of partition, and consequently Mrs. Thoms, who sues in severalty, has no right to recover in her separate action against her co-tenant. This instruction is, therefore, erroneous.

The opinion and instruction given by the Court below, being in some parts different from those herein contained, it is ordered and adjudged, that the judgment rendered by the Circuit Court in the premises be reversed and set aside ; and it is further ordered, that a *venire de novo* be awarded, and further proceedings be thereon had in conformity with this opinion.

BALLZELL, J., dissented.

I do not concur in the decision pronounced in this case, nor in the reasons given by the majority of the Court for its reversal.

The bill of exceptions presents the questions for consideration, and the proper inquiry is, did the Circuit Court err in the instructions given to the jury, or in refusing those asked by the defendant below ?

" The defendant urged that five years' possession of the negro, as in proof, under the statute of limitations, was sufficient evidence of title in him—the Court decided that it was not." The opinion admits

this to be right—as it says, "if allowed, it would take from the jury their province of determining from the testimony whether defendant had five years' possession of Sue before suit." We do not differ in holding that there was no error in this ruling.

"The defendant also *objected* to the *evidence* and *proceedings*, on the ground that it appeared by the evidence of the agreement to distribute the negroes, the children of Phœbe, as they might be born, amongst the children—that said agreement was not valid under the statute of frauds, as an agreement not to be performed within a year from the making thereof, and not in writing." A conclusive answer to this objection is, that it makes no motion, and presents no definite proposition.

Objection is made to the *evidence* and *proceedings*. On this ground alone, the application was properly refused. Its object would seem to be—and this is what with propriety may have been done—to induce the Court to instruct the jury to overrule or disregard the agreement, as being irrelevant or incompetent—these being the only grounds for such a motion. 2 McLean, 596. It cannot be pretended that the evidence was obnoxious to either of these exceptions. The Court decided that this defence could not be set up under the pleadings in this case, but should have been pleaded specially. In this, I do not concur. If the agreement was void under the statute of frauds, and there was no evidence of its execution, the plaintiff must have failed for want of evidence to sustain his case. It is sufficient, however, that the objection was not tenable—it was properly refused, for other causes to be hereafter stated.

The Court charged the jury that "the statute of limitations applies, where the possession is adverse. If the jury are of opinion that defendant had possession, adverse to the claim of Mrs. Thoms, for five years anterior to the bringing of the suit, then plaintiff cannot recover ; but if the possession in defendant has not been adverse, he is setting up no claim but possession merely by permission of Mrs. Thoms, then the statute of limitations does not apply." This, also, was excepted to. If there be error in this, it is in being too favorable to the defendant. The true doctrine on the subject of possession conferring right under a statute of limitations, is contained in the opinion of the Supreme Court of the United States, in Zeller's lessee vs. Eckert, &c., sustained as it is by numerous authorities. It is

there said—" as the possession was originally taken and held in sub-
serviency to the title of the real owner, a clear, positive and continued
*disclaimer* and *disavowal* of the title, and *assertion* of an *adverse
right*, and to be brought *home* to the party, are *indispensable* before
any foundation can be laid for the operation of the statute.   Other-
wise, the grossest injustice might he practiced—for without such no-
tice, he might well rely upon the fiduciary relation upon which the
possession was originally taken and held, and upon the subordinate
character of the possession, as the legal result of those relations."
4 Howard's S. C. R., 296.  The instruction, then, should have been,
not only that adverse possession, but a clear, positive and continued
disclaimer and disavowal of the title on the part of plaintiff, and
assertion of adverse right to be brought home to the plaintiff, were
requisite to sustain the plea of the statute ;  nor was such an error a
ground for reversal at the instance of the plaintiff in error—it was
an injury to his adversary, the plaintiff below, of which he alone can
complain.

The Court charged the jury—" the action is not based upon the
agreement entered into between Petty and wife and the Summeralls.
If it was so based, then the statute of frauds would apply, provided
the contract was executory.  If the contract was executed, then the
statute of frauds cannot apply ;  and as to the fact whether the con-
tract was executed or not, that would be a question for the jury."

I am of opinion that the statute of frauds has no application to the
case.  The statute very clearly contemplates contracts between in-
dependent parties, and not the case of severance or partition between
joint owners, which is rather the dissolution of an existing agree-
ment, than the making a new one, and so do the books treat it.
" The joint tenants' estate in realty may be destroyed, without any
alienation, by merely disconnecting their possession ;  and, therefore,
if two joint tenants agree to part their lands, and hold them in seve-
ralty, they are no longer joint tenants, for they have no joint interest
in the whole, but only a several interest, respectively, in the several
parts."   2 Black. Comm., 185.

Boyd vs. Graves, decided by the Supreme Court of the United
States, was the case of a division and ascertainment of the dividing
line between the proprietors of adjoining lands, by consent of both
parties, and the lands held for many years.   An effort was made to

assert a claim adversely by one of the parties, on the ground of the statute applying, the Court say—" it is not a contract for the sale or conveyance of lands—it has no ingredient of such contract. There is no *quid pro quo*, and the Court do not consider it as a conveyance of title from one person to another." 4 Wheaton, 513. 4 Cond. Rep., 525.

Again : " A parol partition will be enforced." 25 Wendell, 434. 5 Brevard, 97.

In the case under consideration, the increase of the negroes was, no doubt, looked to, like the crop of the planter—the parties concluding to divide as they did, in preference to waiting until all the children should be born—just as three joint ·owners of a plantation should agree that the proceeds of the crop for the first year should be appropriated to A., the next to B., and the third to C. Such a case is to be found in 16 Vermont, 169, between owners of a mill, to occupy severally, in proportion to their interests.

The first position is, that the action is not based on the agreement—as it obviously was not—there being other evidence in the case equally important and essential to plaintiff's recovery. It is not material to inquire, whether the statute would apply to an executory agreement—the more correct position is, that, independent of the statute, a joint owner cannot maintain an action upon a mere agreement to divide.

The last position is, that " the statute of frauds cannot apply if the contract is executed." This proposition is too plain to be questioned. An agreement executed is the case of " a sale and delivery of an article for a price paid," to use the language of Chancellor Kent in his Commentaries, 4 Kent., 450. The point is also expressly decided in Craig vs. Vanpelt, 3 J. J. Marshall, 489.

The third proposition asserted is, that " whether the contract was executed or not was a question for the jury." Whether the agreement was in fact carried into execution, depended upon the testimony of witnesses, some of whom differing in their statements, it became the duty of the Court to refer the question to the jury. In this I perceive no error.

The remaining instruction is, that " where slaves belong to several persons of the same family, the possession is in all." This also, I think, is erroneous. The general rule is, that the property of per-

sonal chattels draws to it the possession, and this whether the owners reside separately or in the same family. The instruction, however, was favorable to defendant below, and to the prejudice of his adversary, and for the reasons already stated is not the ground of reversal.

It is insisted by counsel for plaintiff in error, that "there is no proof of performance on either part—none of any distinct and independent possession of Mrs. Thoms." There is no instruction asked which can raise this question in this Court—it was not presented in the Court below by a motion for a non-suit, or for instructions to the jury to find for the defendant, or that the plaintiff was not entitled to recover. We have seen that the instructions given were not erroneous. Where, then, is the authority for raising a question of fact not presented by the bill of exceptions ? There is none. In Zeller's Lessee vs. Eckert, the Supreme Court say, so far as error is founded upon the bill of exceptions incorporated in the record, it lies only to exceptions taken at the trial to the ruling of the law by the judge, and to the admission or rejection of the evidence. 1 Bac. Ab., 279. Bull, N. P., 316. Beyond this, we have no power to look into the bill on a writ of error, as it is the creature of the statute and restricted to the points stated. *We have no concern* in a writ of error, *with questions of fact, or whether the finding of the jury accords with the weight of the evidence.* The law has provided another remedy for errors of this description, namely, a motion in the Court below for a new trial on a case made. 4 Howard S. C. R., 297. The point was directly presented to the same Court in the case of Garrard vs. Lessee of Reynolds. "This Court is not called upon to express an opinion whether as matter of law, there was any evidence to be submitted to the jury going to establish the intermarriage at or before the time mentioned, because, although this ground was taken by the counsel in the course of the trial below, on a motion for a non-suit, and was overruled, no exception was taken to that decision. The point is therefore *not before us.*" 4 Howard S. C. R., 126.

In Binney vs. The Chesapeake and Ohio Canal Company, the Court say : "the counsel for defendant have insisted, that if the cause cannot be decided upon its supposed real merits, it ought to be remanded to the Circuit Court for the purpose of receiving such modifications as will bring before the Court those questions of law on which the rights of the parties depend. Where error exists in the

proceedings of the Circuit Court which will justify the reversal of its judgment, this Court may send back the cause with such instructions as the justice of the case may require. But if, in point of law, the judgment ought to be affirmed, it is the duty of this Court to affirm it. We cannot reverse a decision which conforms to law, and remand a cause for further proceedings. By C. J. Marshal, 8 Peters, 219.

The same enlightened Court, in the case of Hepburn vs. Dubois, on this subject, use the following emphatic language : " In urging upon this Court a review of the parol evidence in the record, we think the counsel of the plaintiff in error have asked us to transcend the limits prescribed to our action on questions of fact, by an uniform course of decision from the first organization of this Court, which has been repeatedly defined during the present term, unanimous in our opinion on the law, though sometimes differing in its application to particular cases. This Court is committed in language which it neither can nor desires to recall, because that power which we are bound to obey has spoken to us and all the Courts in the United States in terms most imperative. The trial by jury is justly dear to the American people. It has always been an object of deep inter-est and solicitude, and every encroachment upon it has been watched with great jealousy. One of the strongest objections originally taken against the Constitution of the United States, was the want of an ex-press provision securing the right of trial by jury in civil cases. As soon as the Constitution was adopted, this right was secured by the seventh amendment proposed by Congress, and which received an assent of the people so general as to establish its importance as a fundamental guaranty of the rights and liberties of the people." 12 Peters, 376.

It must be admitted that the power of reversal has been carried to a greater extent in this Court, especially in the cases of Ponder vs. Parkhill's administrators and Camp vs. the same, decided in 1848. The defence mainly relied upon in these cases was matter of estop-pel, sustained and controverted by a number of witnesses on both sides. It was submitted to the jury by the Court below with instruc-tions predicated upon this variance in the testimony, who found in favor of plaintiff and against the defence set up. The Supreme Court find no error in the instructions, as they do not notice them, but " looking at the facts" and coming to a conclusion in conflict with

that which the jury, in their exclusive province, had deliberately attained, they set the verdict aside, and reversed the judgment.   They even go further—if that indeed be possible—as if the entire case had been submitted to them by consent of parties, to be tried without a jury—they adjudicate without any pleading, instruction, or exception justifying it, that " the right of property in the slaves in contest passed by the sale to the defendant," p. 275.   Other cases, scarcely less exceptionable, but asserting the same power in a form not so obvious, have also received the sanction of this Court.   I cannot but think that the course of the decision in this case is subject to the same exceptions.

Instructions are directed to be given by this Court on a new trial to be had in the Court below, which I propose to consider.   The first is, that if, from the testimony, the jury believe that the plaintiff, Mrs. Thoms, and defendant, John A. Summerall, had not resided together in the same family for five years or more next before the commencement of this suit, and if they further believe that the defendant had during that period, held possession of Sue, the slave in controversy, under an assertion of right, that then the plaintiff cannot recover in this action, being barred by the statute of limitations. But if they believe, from the proofs, that the plaintiff, Mrs. Thoms, was at any time within five years next before the commencement of this suit, in the *actual* possession of said slave as *her own separate property with the knowledge and consent of defendant*, then they ought to find for the plaintiffs.   Now why the difference in the application of the rule of law between these parties ?   Why this most evident advantage under like circumstances, in favor of defendant over his sister ?   On his part, *possession for five years under an assertion of right*, is made to defeat her suit and secure the property to him. To entitle her to it *actual possession as of her own separate property*, with the *knowledge and consent of the defendant*, is required.   If assertion of right, with possession, give right of property to one joint owner, why not to the other ?   If actual possession as of separate property with the knowledge and consent of his co-tenant, is made indispensable as to one joint tenant, does not the same rule prevail as to the other ?   But an obvious objection to the first instruction is, that there is nothing on the record to justify it.   Not a single witness testified as to any assertion of right on the part of John Summerall.

The witnesses depose to a distinct admission and assertion by him, that the property was·in his sister—his own witness, Vandergriff, deposes at most, that she was called undivided property, that is, not the property of John, but of all the brothers and sisters. These instructions are clearly opposed to the case of Zeller's Lessee vs. Eckert, as to the possession under the statute of limitations, the only pretence of title set up for John A. Summerall. But where is the authority for granting any instructions after the Court has, in this particular point of adverse possession, sustained the instruction given by the Court below ? It is not the practice nor within the power of an appellate Court to frame variant and contradictory instructions according to their own suggestions, except in case of a reversal of the instruction given. If the instruction had been declared erroneous, then the authority exists ; otherwise I regard it as an act of original jurisdiction not justified by law, but obnoxious to all the objections raised against a Court deciding on the controverted facts of a case.

The same objection applies with increased force to the other instruction directed to be given, that " unless the jury believed from the testimony, that after these minors all arrived at full age, they *all* expressly agreed to ratify and abide by the verbal agreement in proof, with the knowledge they were not legally bound by it—in other words, unless they believed that, after the arrival at full age of these parties, they contracted and agreed to be bound by the verbal agreement made in their behalf, and in pursuance of such agreement, actually made a distribution amongst themselves of Phœbe's children belonging to them—that the plaintiff, Mrs. Thoms, had no separate, but a joint right of property sued for, and cannot recover in this action." Now, the defence of infancy had not been raised in the pleadings by the instructions below, nor by the bill of exceptions, nor has it a connection with the instruction which gives rise to it, which was in reference to the statute of frauds. A party may waive a defence, and it is not, I respectfully submit, the province of this Court to set up and impose upon him such as he has waived.—The instruction is still more objectionable, in assuming a position at variance with the facts—the testimony in the record—in deciding that the agreement and evidence showed a contract executory, and not executed. Now, this subject was expressly submitted to the jury, and they found it executed. How, then, can the Court assert a different

conclusion ?   Is it lawful thus to pass upon the facts—to substitute the judgment and opinion of the Court in a matter of contradictory testimony, in place of the verdict of a jury ?   The evidence to show that the agreement was executed has been already reviewed—what is there to show that it was executory ?

After stating that a different kind of ratification is required in one case from the other, we are informed that the case under consideration is executory.   I propose to test the accuracy of this conclusion. The distinction between executory and executed contracts is thus stated by Chancellor Kent : " if, for instance, one person sells and delivers goods to another for a price paid, the agreement is executed, and becomes complete and absolute ; but if the vendor agrees to sell and deliver at a future time, and for a stipulated price, and the other party agrees to accept and pay, the contract is executory, and rests in action merely."   4 Kent, 450.   Striking out then, and disregarding all the testimony, but that of the agreement itself, and we have an executory contract, resting in action—a right to be enforced by suit merely.   Connect with the agreement actual possession and ownership—the assertion of right—a failure to assert claim in opposition, and we have an executed contract—the very case presented by the record.   But there is no authority for this disregard of the testimony in the case, any more than there is in predicating an instruction upon an imperfect view of the evidence, or giving a new instruction, when the old one is sustained.   The quotation from 2 Greenleaf on Evidence, is unfortunate in not applying to the case. The subject treated of by the learned author was the defence of infancy to an *action* of *assumpsit*, which he states " may be avoided by showing that the consideration of the promise was necessaries furnished to him ; or, 2d, a ratification of the contract by a new promise, after he came of age."   § 364.   Under this last head, he makes the remarks quoted by the Court, which, if extended a sentence farther, would have shown, beyond doubt, their true object and purport.   " An explicit acknowledgment of indebtment, whether in terms or by a partial payment,is not alone sufficient—for he may refuse to pay a debt which he admits to be due ;" thus showing that the clause was applicable to debts or engagements of the infant, upon which he might be sued, after he came of age.   Much more pertinent and to the point are the remarks of Lord Mansfield, in

the case of Zouch vs. Parsons—" Miserable must the condition of minors be, if they could do no binding acts. The law, therefore, at the same time that it protects their imbecility and indiscretion from injury, through their own imprudence, enables them to do binding acts for their own benefit and without prejudice to themselves, for the benefit of others."

" If an infant does a right act which he ought to do, which he was compellable to do, it shall bind him, *as if he makes equal partition,* if he pays rent, &c., the authorities are express and the reason decisive, that generally, whatsoever an infant is bound to do by law, the same shall bind him, albeit he doth it without suit of law. A right and lawful act is not within the reason of the privilege which is given to protect infants from wrong. His being compellable by any means and in any way to do it, proves the act to be substantially what he ought to do. A third rule deducible from the nature of the privilege, which is given as a shield and not as a sword, is, that it shall never be turned into an offensive weapon of fraud or injustice." 3 Burrows, 1801–2.

It will not be difficult to maintain that this partition, so far as John Summerall was concerned, was an equal one. His sister and brothers had reason, not *he*, to complain of its inequality. When made, there was but one child of the negress alive, which is assigned to him by the agreement, the others were to have but the prospect of those to be born. Seven children were born to Phœbe, to three of which he was entitled as having first choice, whilst they were entitled only to two. He was the oldest brother, and best able and most competent of all to judge of the arrangement, and profiting so largely by it, it is therefore presumable that he was its author or greatly in favor of it. If, after obtaining his allotment and receiving his share according to the agreement, the negroes received by him die, is it to be tolerated that the deficiency shall be compensated by his brothers and sisters ? Shall he, on that account, be permitted to disaffirm his agreement and bring an action extending over the range of near twenty years, and that too against a sister having claims upon his generosity, his care and his protection ? This would indeed be allowing him to use his privilege as a sword, and to turn it into a most offensive weapon of injustice. The above view of the English Courts is confirmed by the American authorities. " A parol partition of

lands between tenants in common, when fair and equal, and followed by a due execution of it, is binding on all, whether wives or minors." 9 Watts & Sergt., 127. " Where an executrix was also devisee of slaves in common with other executors, and held them for many years, this is evidence there was a division." 3 Monroe, 276.

Supposing, however, this agreement was voidable at the option of John A. Summerall, when is it to be exercised, and how long does the privilege exist ? It will be discovered that the law is by no means silent on this subject. The omission to disaffirm a contract within a reasonable time, has been held sufficient evidence of a ratification. Chief Justice Dallas says, "the infant is bound to give notice of the disaffirmance of a voidable contract in a reasonable time, (four months he thought reasonable in that case.) This principle is recommended by its justice and general convenience. It is unjust that the infant, after his arrival at maturity, and the lapse of a reasonable time, should hold the scales in his hands and decide as future circumstances should incline." Chancellor Kent says, " where the contract is voidable, slight acts and circumstances will be a ground from which to infer assent." 2 Kent., 237. " His confirmation of the act or deed of his infancy may be justly inferred against him after he has been of reasonable age, either from his positive acts in favor of the contract, or from his tacit assent under circumstances not to excuse his silence." 2 Kent, 195. " Acquiescence merely for an unreasonable time is an act that denotes an intent not to rescind the contract." 6 Connect., 506. 9 Vernon, 368.

If the judgment and decision be in favor of defendant, as would seem to be the inevitable result from the opinion of the Court and the instructions directed to be given, the three brothers and sisters will then occupy their first position of joint tenants. Will John A. Summerall, on an account to be taken by a Court of Chancery for a division of the property, be charged with the three negroes he has received, and bring them into account, or are they to be rejected, and his brother and sister to account to him for those received by them and pay him ? I cannot think that any Court of Equity would hesitate for a moment to affirm the agreement, and to hold the parties all bound by it. To turn these parties round to a suit in Chancery for a new adjustment of matters long since settled between them by pos-

itive agreement well understood and acted upon for years, never complained of until recently, and merely because one of them originally having an advantage over his younger brother and sister loses it through accident or otherwise, is a proceeding to which I can never give my assent.

It is not in evidence as to the precise time when John Summerall came of age. One of the witnesses, Fennimore, says : " He heard John say, that Sue belonged to Eliza. John was of age—he was not married at the time—it was eight, or ten, or twelve years since." John married in 1835—Thoms married in 1845. Now Petty, who made the sale of the negro, and seems acquainted with the circumstances, says : " He don't know of the agreement being disputed, until after the marriage of Thoms." His own brother, who had lived with defendant until the year 1843 or 1844, never heard him claim Susan ; and his possession of the girl would seem to have been owing to his better fortune of having a home and family, whilst his sister, as stated by one of the witnesses, " had no home for Sue." If this was not an affirmance of the agreement and ratification, not only implied but express, then I confess I am at a loss to understand the authorities.

I have not alluded to another feature in the case of no little consequence in its consideration. This arrangement was made by the guardian of the children with their consent—he bought the negress and sold her (in legal presumption) afterwards before the children came of age—he had a right to sell her children after they were born, so soon as they could, with propriety, be separated from the mother. The general rule is, that it is the " duty of a guardian to sell the personal property." 1 Vern., 335, 403. Reeves' Dom. Rel., 326.

In case of sale of these children, his account before the Judge of Probate with each of them, would be separate for his portion—this, itself, is partition in a different manner. What, then, is to prevent a division of the specific property without sale amongst his wards, if he judges it proper and to their interest. Having done so, his arrangement could only be set aside on the score of fraud. Field vs. Schieffelin, 7 John. Chy., 155.

In every point of view in which I have been able to regard the case, I see no reason to disturb the verdict and judgment of the Court below. 41